GARRETT, J.
hThe defendant, Dalton Fletcher, was convicted of two counts of second degree murder in the shooting deaths of his parents. He was initially sentenced to two concurrent mandatory sentences of life imprisonment at hard labor, without benefit' of parole, probation, or suspension of sentence. We affirmed his convictions. State v. Fletcher, 47,777 (La.App.2d Cir.4/10/13), 112 So.3d 1031. However, due to the United States Supreme Court’s holding in Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which prohibits mandatory life sentences without parole for juvenile killers, this court vacated his sentences and remanded the matter to the trial court for resentencing after conducting a review of the appropriate factors enunciated in the Miller case. After conducting a Miller hearing, the trial court again sentenced the defendant to two concurrent sentences of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The defendant appeals. We affirm the defendant’s sentences.
FACTS AND PROCEDURAL HISTORY
On the night of September 9, 2010, Johnny and Tammy Fletcher were murdered at their West Monroe home by their son, who was 15 years and eight months old. The defendant entered the bedroom where his parents were sleeping and shot his father in the arm with a shotgun. The weapon then jammed. The defendant fled from the room, and his father ran after him. In the kitchen, Mr. Fletcher asked his son why he shot him. The defendant— who had unjammed the shotgun — responded by shooting his father in the face, killing him instantly. The defendant returned to the|2bedroom where he shot his mother in the head as she tearfully begged for her life. She too died instantly. The defendant’s 19-year-old sister witnessed the murder of their mother. The defendant threatened to kill his sister with the shotgun and forced her to stay in her bedroom for the rest of the night. The next morning, the defendant drove to school in his mother’s car. After he left, his sister fled to a friend’s house. The police were alerted, and the defendant was arrested at school. The murder weapon was found in the trunk of his mother’s car, along with three shotgun shells. After his arrest, the defendant confessed to the murders, which he admitted planning for a month and a half.
The defendant was charged with two . counts of second degree murder. He pled not guilty and not guilty by reason of insanity. Due to this plea, both the defense and the prosecution presented evidence at trial pertaining to the defendant’s mental health. The defense presented the testimony of Dr. Mark Vigen, a psychologist, while the state called Dr. George Seiden, a psychiatrist. Each had conducted a pretrial examination of the defendant, and both testified that he was able to *937 distinguish between right and wrong at the time of the murders, thus invalidating his claim of insanity. The jury found the defendant guilty as charged.
The trial court ordered a presentence investigation (PSI) report. At a sentencing hearing in February 2012, the trial court ordered the defendant to serve two concurrent terms of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. While acknowledging that the second degree murder statute provided for a|smandatory sentence, the trial court nonetheless considered on the record the information contained in the PSI report, the gruesome circumstances of the murders, and the relevant factors under La. C. Cr. P. art. 894.1 before imposing sentence. The defendant’s motion to reconsider sentence was denied.
On appeal, this court affirmed the defendant’s convictions. However, in light of the recent cases of Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and Miller v. Alabama, supra, we held that it was necessary to vacate the mandatory sentences imposed upon the defendant and remand the case for the trial court to conduct a more specific and thorough review of the factors discussed in Miller, supra, in addition to the factors considered in La. C. Cr. P. art. 894.1. We directed the trial court to state the reasons for sentencing on the record. Following our remand order, the Louisiana legislature enacted legislation in response to Miller, which will be discussed below.
In August 2013, the defendant filed a Motion to Declare Unconstitutional the Provisions of La. R.S. 14:30.1, La R.S. 15:574.4(E) and La. C. Cr. P. art. 878.1. He also filed a Motion for Jury Determination of Sentence. These motions were denied by the trial court on October 10, 2013, immediately before the Miller hearing ordered by this court.
At the Miller hearing, the state presented the testimony of Dr. Seiden, while the defense called Dr. Vigen. Numerous documents were introduced into evidence. At the conclusion of the hearing, the trial court painstakingly articulated well-considered reasons for ruling before once again sentencing |4the defendant to concurrent sentences of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
The defendant’s timely motion to reconsider sentence was denied on November 12, 2013. The defendant now appeals, urging four assignments of error.
MILLER V. ALABAMA AND ITS CONSEQUENCES
In Louisiana, the offense of second degree murder is punishable by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1.
However, in Miller v. Alabama, supra, the Supreme Court held that the Eighth Amendment prohibits mandatory life sentences without parole for offenders under the age of 18 who committed homicides. This ruling followed on the heels of the Court’s previous rulings in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which barred capital punishment for all juvenile offenders under the age of 18 at the time of their crimes, and Graham v. Florida, supra, which disallowed sentences of life without parole for juvenile non-homicide offenders. Both of these decisions were likewise premised upon the Eighth Amendment’s prohibition of “cruel and unusual punishments.”
The Miller court stated, in relevant part:
*938 Roper and Graham establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, “they are less deserving of the most severe punishments.” Graham, 560 U.S., at [68], 130 S.Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a “ ‘lack of maturity and an underdeveloped sense of [¿responsibility,’ ” leading to recklessness, impulsivity, and heedless risk-taking. Roper, 543 U.S., at 569, 125 S.Ct. 1183. Second, children “are more vulnerable ... to negative influences and outside pressures,” including from their family and peers; they have limited “contro[l] over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievabl[e] deprav[ity].” Id., at 570, 125 S.Ct. 1183.
[[Image here]]
Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.... And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
[[Image here]]
We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. Graham, 560 U.S., at [75], 130 S.Ct., at 2030 (“A State is not required to guarantee eventual freedom,” but must provide “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation”). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [defendants’] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between “the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Roper, 543 U.S., at 573, 125 S.Ct. 1183; Graham, 560 U.S., at [67-70], 130 S.Ct., at 2026-2027. Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.
*939 Graham, Roper, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment’s ban on cruel and unusual punishment. [Emphasis added.]
In response to Miller, the Louisiana legislature crafted La. C. Cr. P. art. 878.1 and La. R.S. 15:574.4(E). See Acts 2013, No. 239, effective August 1, 2013.
La. C. Cr. P. art. 878.1 addresses whether a juvenile killer’s life sentence is to be imposed with or without parole eligibility, and it states:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).
B. At the hearing, the prosecution and defense shall be allowed to .introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender’s level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
If a sentencing court imposes a juvenile killer’s life sentence with parole eligibility, the following provisions of La. R.S. 15:574.4 apply:
E. (1) Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial [ -¡-determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1 and all of the following conditions have been met:
(a) The offender has served thirty-five years of the sentence imposed.
(b) The offender has not committed any disciplinary offenses in the twelve consecutive months prior to the parole eligibility date.
(c) The offender has completed the mandatory minimum of one hundred hours of prerelease programming in accordance with R.S. 15:827.1.
(d) The offender has completed substance abuse treatment as applicable.
(e) The offender has obtained a GED certification, unless the offender has previously obtained a high school diploma or is deemed by a certified educator as being incapable of obtaining a GED certification due to a learning disability. If the offender is deemed incapable of obtaining a GED certification, the of *940 fender shall complete at least one of the following:
(1) A literacy program.
(ii) An adult basic education program.
(iii) A job skills training program.
(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections.
(g) The offender has completed a reentry program to be determined by the Department, of Public Safety and Corrections.
(2) For each offender eligible for parole consideration pursuant to the provisions of this Subsection, the board shall meet in a three-member panel, and each member of the panel shall be provided with and shall consider a written evaluation of the offender by a person who has expertise in adolescent brain development and behavior and any other relevant evidence pertaining to the offender. (8) The panel shall render specific findings of fact in support of its decision.
Louisiana courts have applied and interpreted the Miller case and Louisiana’s statutory implementation of its principles. In State v. Tate, 2012-2763 (La.11/5/13), 130 So.3d 829, cert. denied, — U.S. —, 134 S.Ct. 2663, 189 L.Ed.2d 214 (2014), the Louisiana Supreme Court found that the Miller prohibition against mandatory life imprisonment without parole for juvenile murderers does not apply retroactively in state cases on collateral review and that the Louisiana statutes addressing Miller apply prospectively only.
|sThe Tate decision has been- followed by the courts of appeal to bar application of Miller in cases involving collateral reviews. See State v. Griffin, 49,146 (La.App.2d Cir.6/25/14), 145 So.3d 545; State v. Wyatt, 48,598 (La.App.2d Cir.8/13/14), 2014 WL 3931112; State v. Stewart, 13-639 (La.App. 5th Cir.1/31/14), 134 So.3d 636.
In State v. Smoot, 13-453 (La.App.5th Cir.1/15/14), 134 So.3d 1, the fifth circuit found the trial court complied with the Miller principles at the sentencing hearing, which occurred before the enactment of La. C. Cr. P. art. 878.1 and La. R.S. 15:574.4(E). The appellate court affirmed the imposition of a sentence of life imprisonment without benefit of parole upon a juvenile defendant who shot an elderly, homeless drug addict multiple times.
In State v. Baker, 2014-0222 (La.App.lst Cir.9/19/14),— So.2d —, 2014 WL 4656496, the first circuit affirmed the convictions and life sentences with parole eligibility imposed upon a juvenile killer involved in three shooting homicides. It rejected the defendant’s argument that the trial court should have quashed his indictment on the basis that Miller invalidated the mandatory penalty provision of La. R.S. 14:30.1, thereby prohibiting him, as a juvenile, from being sentenced as an adult in district court to life without parole. The appellate court held that Miller did not prohibit life imprisonment without parole for a juvenile killer in every case, but only required the sentencing court to consider the offender’s youth and attendant characteristics as mitigating factors before deciding to impose such a lasentence. Furthermore, the court ruled that the state continued to have the right to prosecute the defendant in district court.
In State v. Brooks, 47,394 (La.App.2d Cir.12/12/12), 108 So.3d 161, writ denied, 2013-0080 (La.5/31/13), 118 So.3d 393 (Brooks I), this court affirmed the second degree murder conviction of a juvenile defendant who, armed with an assault rifle, participated in a “senseless gunfight” which resulted in the death of an innocent bystander. However, we vacated the mandatory sentence of life imprisonment *941 at hard labor, without benefits, and remanded the case to the trial court for re-sentencing in light of the Miller holding. Following a sentencing hearing conducted pursuant to La. C. Cr. P. art. 878.1, the trial court again imposed a sentence of life imprisonment without parole. In State v. Brooks, 49,033 (La.App.2d Cir.5/7/14), 139 So.3d 571 (Brooks II), this court affirmed the sentence, finding that the trial court had “dutifully” complied with our instructions in the prior opinion and that the sentence imposed was not constitutionally excessive.
The instant case is now in the same posture as Brooks II — after the defendant’s conviction was affirmed but the mandatory sentence vacated on the initial appeal, the trial court conducted a Miller hearing on remand and then imposed the same sentence as before. This appeal requires us to determine whether the trial court erred in imposing that sentence. However, we must also address the rulings made below upholding the constitutionality of the Louisiana Miller statutes.
^CONSTITUTIONALITY OF LOUISIANA STATUTES IN LIGHT OF MILLER
In one of his four assignments of error, the defendant contends that the trial court erred in denying his Motion to Declare Unconstitutional the Provisions of La. R.S. 14:30.1, La. R.S. 15:574.4(E) and La. C. Cr. P. art. 878.1.[1] As to La. R.S. 14:30.1, the second degree murder statute, the defendant complains that the legislature failed to amend it to comply with the Miller prohibition of a mandatory life sentence without possibility of parole for juvenile killers. He further contends that La. R.S. 15:574.4(E) and La. C. Cr. P. art. 878.1 do not comply with Miller. In particular, he argues that La. C. Cr. P. art. 878.1’s determination of parole eligibility at the time of sentencing fails to satisfy the Eighth Amendment or Miller, as does the alleged absence in the statute of any directive to specifically consider the juvenile’s youth and other age-related characteristics. The defendant further argues that a judicial determination on parole eligibility made at sentencing is unconstitutional because it precludes any consideration of how the juvenile matures and may be rehabilitated during imprisonment, and it creates the potential for a disproportionate sentence for the juvenile, whose youth requires treatment different from adults.
The attorney general argues that La. R.S. 14:30.1 is constitutional on its face. Life imprisonment without parole is not an unconstitutional sentence for adults and Miller did not preclude life without parole for juveniles. It merely required that a sentencing court consider mitigating |nfacts related to the juvenile’s youth before imposing a sentence without benefit of parole. The attorney general asserts that the argument that La. C. Cr. P. art. 878.1 is unconstitutional is without merit because the statute eliminates the mandatory sentencing scheme for offenders under age 18 when they committed first or second degree murder. The statute also considers an offender’s youth by requiring a sentencing hearing and consideration of youth-related and other relevant factors. The attorney general also argues that the law is constitutional as applied to the defendant in this case because the trial court extensively considered his youth and all age-related evidence.
The state adopts the attorney general’s arguments. It additionally maintains that the new statutes comply with Miller and *942 the Eighth Amendment by creating exactly what Miller demanded — a sentencing scheme that includes a hearing at which the trial court considers aggravating and mitigating evidence regarding the defendant’s crime, criminal history, social history, and family support, and reserves sentences without parole for the worst offenders and offenses.
We find no error in the trial court’s denial of the defense motion to declare the statutes unconstitutional. Like the trial court, we observe that the Miller court was presented with an opportunity to categorically declare that no juvenile murderer shall be imprisoned without benefit of parole, but it specifically refused to do so. The Supreme Court plainly recognized that the circumstances of some murders and the characters of some juvenile 112killers would warrant the imposition of the “harshest possible penalty,” and it gave the sentencer latitude to respond appropriately to those situations.
The Louisiana legislature promptly addressed the Miller directive against mandatory life-without-parole sentences for juvenile killers by devising a sentencing procedure which would require that a trial court sentencing a youthful offender review all pertinent factors before determining whether parole eligibility was warranted. By its very application to only murderers under the age of 18, the provisions of La. C. Cr. P. art. 878.1 mandating a sentencing hearing at which the defense will be given an opportunity to present mitigating factors — which obviously include the defendant’s age as an important part of his social history — satisfy Miller’s requirement that mitigating factors favoring a juvenile killer be heard in a proceeding held for that purpose. Furthermore, we find that Miller does not require deferral to the distant future of the determination of whether to allow parole eligibility.
Contrary to the defendant’s claim, the legislature was not required to amend the second degree murder statute itself to provide for sentencing of juvenile killers. As noted by the attorney general, life without parole is still a constitutionally acceptable sentence for adult killers and it is not a prohibited sentence for all juvenile killers. Our legislature carefully designed an adequate solution by adding a new statute pertaining to parole eligibility for juvenile killers which is to be read in conjunction with the first and second degree murder statutes. In the event that the trial court imposes a life sentence with parole eligibility, La. R.S. 15:574.4(E) | ^provides conditions which must be satisfied before the defendant can apply to the parole board for parole consideration.
Based on the foregoing, we find no constitutional deficiencies under Miller in the challenged Louisiana statutes, and we affirm the ruling made below. This assignment of error lacks merit.
JURY DETERMINATION
In this assignment of error, the defendant contends that the trial court erred in denying his motion for jury determination of his sentence. In this motion, the defendant contended that the Eighth and Fourteenth Amendments of the United States Constitution and Art. 1, § 20 of the Louisiana Constitution require that the determination of whether his sentence should be served without the possibility of parole must be made by a jury. In support of this assertion, he cited Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In brief, he also cited Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). These *943 cases essentially stand for the proposition that, due to a defendant’s Sixth Amendment right to a jury trial, aggravating factors which operate as the functional equivalent of an element of a greater offense and thereby increase the penalty must be submitted to a jury and proved beyond reasonable doubt. The defendant claims that Miller effectively creates a new “statutory maximum” of life with parole eligibility for a juvenile killer; consequently, in order to sentence a juvenile killer to life without parole | ^eligibility, there must be a finding by a jury of an aggravating factor that the juvenile is irrevocably corrupt.
The attorney general argues that there is no need for a jury under Apprendi' because neither Miller nor La. C. Cr. P. art. 878.1 requires the trial court to make any factual findings. According to the attorney general, the provision in the statute that “ [sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases,” was intended to mirror Miller and establish that sentences of life without benefit of parole would be reserved for rare cases, where the trial court found the harshest sentence was appropriate for the juvenile offender and the offense. It also acknowledges the longstanding and much-cited rule of general sentencing law that maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses.
The state adopts the attorney general’s brief on this issue and adds that Miller does not require the trial court to specifically find the defendant is “irretrievably depraved.” The state also argues that the maximum sentence is life without parole and the minimum sentence is life with parole, so there is no additional element required in order to impose a life sentence without parole. Therefore, Apprendi and its progeny do not apply. The state argues that La. C. Cr. P. art. 878.1 brought Louisiana’s sentencing scheme for juveniles convicted of committing first or second degree murder in compliance with Miller.
We find the arguments of the attorney general and the state to be persuasive and agree with the ruling made below. We have reviewed the 11fiApprendi, Ring, and Blakely cases, and find them inapplicable to the instant situation. Miller does not require proof of an additional element of “irretrievable depravity” or “irrevocable corruption.” It merely mandates a hearing at which youth-related mitigating factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility.
This assignment of error lacks merit.
EXCESSIVE SENTENCES
In two assignments of error, the defendant argues that the trial court imposed unconstitutionally excessive sentences upon him. He contends that his sentences violate the Eighth Amendment’s ban against cruel and unusual punishment, and fail to comply with the Miller holding. The defendant further asserts that the trial court erred in concluding that he is the worst offender, that the crimes are the worst cases, and that denial of parole eligibility was warranted without a determination that he is irrevocably incorrigible.

Law

The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record *944 reflects that he adequately considered the guidelines of the article. State v. Williams, 48,525 (La.App.gd,,, Cir.11/20/13), 128 So.3d 1250. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La.App.2d Cir.4/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.6/24/05), 904 So.2d 728.
Second, a sentence violates La. Const, art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Haley, supra. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166. As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Williams, supra.

Discussion

We note at the outset that the trial judge who imposed the sentences in this case is the same judge who, since September 2010, has presided over the pretrial, trial, and post-trial proceedings in this matter and is intimately familiar with all of the circumstances of this case.
We have also conducted a complete and thorough review of the entire record of all of the proceedings, including all of the testimony and evidence adduced at the trial and the Miller hearing, and all of the exhibits introduced in these proceedings. The trial court utilized all of this information in |17imposing sentence. The trial court’s conclusions and observations about what occurred in this heinous matter are all borne out by the record. The evidence simply does not support or corroborate in any manner the defendant’s attempts to portray himself as a hapless abused child forced to kill to end his torment at the hands of an abusive parent. Furthermore, contrary to the defendant’s arguments, we do not find that the trial court failed to consider the appropriate factors under La. C. Cr. P. art. 878.1 and La. C. Cr. P. art. 894.1, or that it imposed excessive sentences.
The defendant claims that he murdered his parents because his father physically abused him beginning when he was 13 years old and his mother failed to prevent the alleged abuse. Because he perceived that the parents had “done him wrong,” he contends that he should not be considered “the worst offender” and his gruesome shotgun murders of his parents should not be construed as the “worst offenses.” He also maintains that he is not “the worst offender” because he did not also kill his sister when he murdered their parents.
The evidence in the record before the trial court and this court establishes that the defendant was raised in a normal, mid-die-class family with two caring, involved parents and an older sister. His electrician father and nurse mother provided him with a comfortable home environment with many amenities. His health needs, including braces, were readily attended to by his parents. He had dirt bikes and four-wheelers at his disposal, and he was given his own car, a Jeep, to drive when he received his driving permit. His father taught him to hunt, an activity which the boy greatly 1 ^enjoyed. The defendant also participated in sports, including football. His mother attended all of his games; his father was not able to attend as often due *945 to health issues and work. The defendant was a good student, frequently making the honor roll throughout his school career. However, the defendant had disciplinary problems beginning in first grade, long before he was allegedly abused by his father. On numerous occasions, he was suspended for fighting and he was almost expelled for it at least once. The defendant told Dr. Seiden that he enjoyed fighting, a statement which greatly concerned the psychiatrist as a portent for future violence. Dr. Seiden concluded that the defendant’s fighting was characteristic and part of his aggressive personality, not a result of abuse or “modeling” his behavior on anything his father did.
The defendant’s parents established reasonable rules for the defendant and his sister to follow as teenagers. These included chores, curfews, and respectful behavior toward their parents. Beginning at about age 13, the defendant chafed at these rules, arguing with the parents and defying them. As a result, he lost privileges and was grounded on many occasions. According to his sister, there were loud arguments and, on one occasion in July 2010, their father punched a door after the defendant slammed and locked the door during one such argument. On other occasions, she saw the defendant try to physically attack their father, who pushed the youth away.[2] The sister emphatically refuted her brother’s | ^claims of physical abuse by their father, and the trial judge who observed her testimony found her to be credible.
The defendant’s' dating life was also problematic. He and his girlfriend broke up several times. He threatened suicide over these breakups, once telling her over the phone that he was placing a shotgun barrel in his mouth.[3] When they reconciled, he would then postpone his suicide plans. When they broke up in May 2010, the defendant decided that he would have “a crazy summer” and then commit suicide after school started. During the summer, he drank excessively and engaged in criminal activities. He admitted to committing numerous thefts. These included stealing from a church on more than one occasion, as well as from an elderly neighbor’s shed and from hunting camps. However, the defendant and his girlfriend reconciled and he postponed his suicide plans again.
On August 31, 2010, only nine days before the murders, the defendant’s mother took him to see his pediatrician, Dr. Joaquin Rosales, because she was alarmed by the defendant’s behavior and drinking and she feared he was using drugs. The de *946 fendant claimed to Dr. Seiden that he reported his father’s alleged abuse to Dr. Rosales; he even asserted to Dr. |2flVigen that he told Dr. Rosales that he wanted to kill his father. However, the pediatrician denied these claims at the defendant’s trial and further said he never suspected any abuse. Dr. Rosales also testified that he was familiar with the post-traumatic stress disorder (PTSD) criteria for children and the defendant did not meet them. Dr. Rosales testified that he talked to the defendant privately and that the defendant was angry about being grounded and felt his parents were too hard on him. The doctor discussed with him positive ways in which he could earn back his privileges. According to his sister, the defendant was upset that their mother took him to see Dr. Rosales.
At about this time, the defendant wrote what purported to be a suicide note. Despite his later claims of abuse, he did not mention anything in the note about his father abusing him. Instead, he told his parents he really and truly hated both of them and if they “would have just let me do what I wanted when I wanted then this would not happen.”
On September 9, 2010, the defendant and his girlfriend broke up yet again. The girlfriend later told the police that the defendant seemed to accept the breakup and they agreed to go to homecoming together in a few weeks. When their phone conversation ended at 10:10 p.m., the defendant seemed “calm.” Although the defendant did not blame his parents for the breakup, he told Dr. Seiden that when he lost his girlfriend, he lost “everything” and he didn’t want to live anymore. Because he viewed his parents as his “source of pain,” he decided he didn’t want them to live anymore. Because his father said that he and the defendant’s mother worked like a team, the defendant said he decided to “kill them like a team.” |21He also told Dr. Seiden that he had been fantasizing about killing his parents for awhile, especially his father. That night — less than two hours after his phone conversation with his girlfriend — he decided to turn his macabre fantasy into a sickening reality.
As the defendant prepared to begin his brutal attack on his sleeping parents, his sister arrived home early from her restaurant job. This unexpected event forced the defendant to return to his bedroom where he retreated under the bed covers with his shotgun. He waited until his sister turned on the bathroom shower before beginning his killing spree. After hearing loud noises, his sister got out of the shower and looked out in the hallway twice. The first time, she saw nothing unusual and closed the bathroom door. After hearing another loud noise, she looked again. This time she saw the defendant fire the shot which killed their mother and she screamed. Having executed his parents, the defendant turned his attention to his frightened sister. She shut and tried to lock the bathroom door. The defendant forced the door open and pointed the shotgun at her, declaring that he had to kill her because she would tell and he didn’t want to go to jail. She begged him to let her live and promised not to tell on him. At one juncture, he pointed the gun at his own head, but his sister pleaded with him not to kill himself. He ordered her to stay in her room, saying that he would kill her if she came out. He took her cell phone and threw it in the room where their mother’s body lay. She considered trying to use her computer to send a plea for help. Ultimately, she didn’t because she was terrified the defendant would kill her and himself if he heard or saw the police arriving. | g2The next morning he returned her cell phone, telling her not to tell anyone what had happened and that he would contact her later. Be *947 fore leaving for school, the defendant heard his father’s cell phone ring. He returned the call to his father’s coworker, informing the man that his father was sick and unable to come to work. As soon as the defendant left for school, his sister fled to a friend’s house.
The defendant said that he went to school to say goodbye to his girlfriend and that he was going to kill himself with the shotgun later that day. When Dr. Vigen was asked on cross-examination why the defendant would take three shotgun shells with him if he only planned to commit suicide, the psychologist admitted that one appropriately placed shell would be enough for suicide and that he had not asked the defendant what he intended to do with three shells.
Because the defendant entered a plea of not guilty by reason of insanity, mental health experts examined him before trial and testified at both the trial and at the Miller hearing. Dr. Vigen, the defense’s psychologist, opined that the defendant suffered from PTSD and major depression. Much of Vigen’s opinion apparently relied upon the defendant’s self-serving and unsubstantiated claims that his father began abusing him at age IB. Dr. Seiden, the psychiatrist called by the state, diagnosed a dysthymic disorder, or a chronic mild to moderate depressive disorder. He disagreed with Dr. Vigen’s PTSD diagnosis on the basis that the defendant did not suffer from several of the hallmark symptoms for this disorder. One of the notable symptoms he lacked was nightmares or | ^recurring dreams. The defendant told Dr. Seiden he had none before the murders; however, afterwards, he had recurring dreams about beating his father and “[i]n my dreams, I never lose.”[4]. Based upon his evaluation, Dr. Seiden concluded that the defendant was “an unhappy angry young man.”
At the original sentencing hearing in February 2012, the trial court observed that the defendant had expressed what appeared to be “sincere remorse” in a letter written to the court. However, two months after that hearing, the defendant wrote another letter which thoroughly discredited his declaration of remorse. In this April 21, 2012, letter to a female inmate with whom he had been corresponding, the defendant openly discussed the murders.[5] He recounted how easy it was for him to kill, how he was still capable of killing, and how he wished he could relive the murders and prolong his parents’ suffering. The defendant admitted that he intended to kill his sister, but this plan was frustrated by his arrest. He expressed a continuing desire to kill not only his sister, but his “whole family.” The defendant discussed the possibility of enticing his sister to visit him in prison and then killing her during the visit. He recounted mentally torturing his sister the night of the murders, as well as physically torturing a younger cousin as part , of his preparations for his parents’ murders. Shortly ^thereafter, in May 2012, the defendant wrote a letter to his sister in which he asked her to visit him in prison.
When Dr. Seiden and Dr. Vigen testified at the Miller hearing, they were ques *948 tioned extensively about these two letters. Both expressed grave concerns about the defendant’s statements in them. As to the letter to the sister, both doctors noted the defendant’s lack of empathy for his sister and her suffering. The doctors also discussed the difficulty in reliably predicting future violent behavior.
Although unable to predict the defendant’s future behavior with certainty, Dr. Seiden was able to enumerate several factors indicating an increased risk of future violence by the defendant. They included the defendant’s history of and enjoyment of fighting;' his early alcohol abuse; his history of other criminal acts (i.e., stealing); his threats to kill his sister at the time of the parents’ murders; and the fact that the murders of the defendant’s parents were planned over an extended period of time and were not impulsive acts. Additionally, Dr. Seiden discussed the many factors in the defendant’s letter to the female inmate, which significantly increased the risk for future violence. They included the defendant’s declarations that (1) his arrest at school frustrated his plan to kill his sister later that day; (2) it was easy to kill his parents and that he could still kill; (3) he still thinks of killing his sister if ever released; (4) he tortured a younger cousin and tortured and killed animals. Most ominous to Dr. Seiden was the defendant’s expression of no remorse for killing his parents. The additional information Dr. Seiden gleaned from this letter also suggested to him that |2sthe defendant might suffer from Antisocial Personality Disorder (APD) or psychopathy.
In his report to the court, Dr. Vigen initially discounted the defendant’s statements in the April 2012 letter, speculating that he was exaggerating and “embellishing” to impress the female inmate to whom he was writing. However, taking the statements at face value, Dr. Vigen conceded that many were “disturbing,” particularly the lack of remorse, the torture of animals and a cousin, and his murderous plan toward his sister. Dr. Vigen went on to conclude that if thé defendant’s admissions were truthful, he would meet the criteria for a diagnosis of APD and there would be a high likelihood that he is psychopathic. In his testimony, he admitted that APD and psychopathy increase the risk for violent behavior. However, he also testified that some people in prison diagnosed with APD at age 18 no longer have it at age 55.
Dr. Seiden testified that he has evaluated hundreds of accused murderers in his career, some of whom were adolescents. He stated that the instant case was in the top 10 of the worst cases he had been asked to evaluate. Dr. Vigen testified that he had evaluated 161 murderers and that this was “a severe case.”
At the conclusion of the testimony at the Miller hearing, the defendant asked to address his family. He briefly apologized and asked them to forgive him. Following argument by counsel, the trial court took a two-hour recess before reconvening to impose sentence. The trial court carefully reviewed the jurisprudence and gave thorough, well-considered [^reasons for sentencing. It considered the Supreme Court’s progression from Roper and Graham to Miller and the underlying reasons for modifying sentences imposed upon vulnerable, impulsive juvenile criminals. The court described the two 14-year-old killers in the Miller case — Jackson, who had a family history immersed in gun violence and was not the shooter in an armed robbery of a video store; and Miller, a suicidal drug addict with a drug-addicted, alcoholic mother and an abusive stepfather, who killed a man by beating him with a baseball bat and setting fire to his home *949 after using drugs with the man and then trying to rob him. The court contrasted the sad, hopeless existence of those neglected boys with that of the defendant, who was just shy of his 16th birthday when he chose to brutally murder his caring parents whose hard work and concern had gifted him with a stable, comfortable life.[6] The court stated that it had considered the testimony and reports of the mental health experts, as well as letters from the defendant’s relatives, all of whom pleaded with the court to deny parole eligibility to the defendant because they feared for their lives should he ever be released from prison.[7] The court found that their fear was well founded.[8] The court 127further adopted all prior reasons for ruling made at the original sentencing hearing.
The trial court specifically addressed the defendant’s allegations of abuse by his father and found that there was no evidence in the record tending to corroborate the claims beyond the defendant’s self-serving assertions. The court observed that in the time period immediately before the murders the defendant had begun engaging in highly destructive behavior and that his parents tried to rein him in to prevent him from “ruining his own life,” as one relative stated in a victim impact statement. The court found no evidence suggesting that any parental discipline to which the defendant was subjected rose to the level of abuse.
The trial court articulated what it considered to be important factors pertaining to the defendant’s brutal crimes. Among them was the fact that the murders were not impulsive acts, but actions that the defendant had planned for some time. In his letter to the female inmate, the defendant stated that he had tortured a young cousin because, when he was 14 years old, he wanted to know what it felt like to kill someone and he wanted to be sure he could kill “when the time comes.” While the court agreed with Dr. Vigen that there might be some embellishments in the letter, it nonetheless found the document contained significant and relevant statements which should be highlighted. The court read portions of the letter into the record, noting that it contained observations made by the defendant upon reflection | i>smore than a year after the murders and months after he was convicted. The court further noted that this letter was written only four months after the one the *950 defendant wrote to the trial court expressing what the court now considered to be insincere remorse. At the conclusion of its exhaustive review of all relevant factors, the trial court then reimposed the same sentences as before — life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
We find no errors on the part of the trial court. It precisely fulfilled the directive of this court to conduct a Miller hearing, to make a more specific and thorough review of the relevant factors, and to state its reasons for sentencing on the record. Additionally, pursuant to our own careful review of the entire record, we find that the sentences imposed are not constitutionally excessive.
The defendant executed his own parents in cold blood. He callously committed both patricide and matricide, arguably two of the most reprehensible acts a person can commit. Furthermore, he committed these crimes in what can only be described as a grotesque fashion, literally blowing off the faces of his parents with a shotgun.[9] The only genuine remorse expressed' by the defendant was that he could not prolong the suffering of his parents as he murdered them or relive the experience. Furthermore, even after committing these heinous murders and being imprisoned, the defendant still aspires to kill his sister. His remaining ^family members live in terror of the possibility that he will someday be freed to carry out his expressed desire to murder his “whole family.” The testimony of the mental health experts inspires no realistic hope that this violent offender — who has numerous risk factors for future violence and indicators of APD or psychopathy — will ever be amenable to rehabilitation. Despite his youth, this defendant is truly one of the worst offenders who committed the worst offenses and is consequently deserving of the harshest sentences which the law may mete out.
These assignments of error lack merit.
CONCLUSION
The defendant’s sentences are affirmed.
AFFIRMED.
JjjAPPENDIX:
Pertinent excerpts from the defendant’s April 21, 2012, letter to a female inmate are as follows:
Yes — my mom did see my dad beat me a few times. And no she didn’t do a damn thing to stop it and she didn’t try to talk to me about it. She just said that she loves me and so does my dad and I never talked to her about it. When we were together we just acted like nothing happened but really, I was just hiding it all, waiting for my chance to get him back at some point. And I kept waiting for my mom to say something but she didn’t wanna talk about it and that’s when she would say that she and my dad loves [sic] me. You may know what it feels like to want to kill somebody but you don’t know how it feels to [actually] do it. There is a lot of people who have killed other people and not everyone takes it the same way. My problem is not with the killing itself or even know that I killed my own mother and father [sic]. It doesn’t hurt me to know and think about those things. What hurts the most and what scares me the most is knowing how fuckin’ easy it was. I was more scared walking into that dark bedroom with a gun in my hands knowing and not knowing at the same time what’s going to happen and/or how it’s going to happen. It was so *951 easy to stand there and pull that trigger and shoot my dad while he slept.... That’s what gets to me, knowing how easy it was and knowing that I’m still capable of killing. I think about that night a lot, I wonder what I could have done differently and not like you think. What I think about is how I could have caused more pain upon my dad. I shot him in the arm first and after he chased me down the hall and into the kitchen, I turned around and looked at him in the eye and all I saw there in his eyes was sadness. I was expecting anger but compared to what I was feeling at the time, he just couldn’t compare to me and my anger. The last thing my dad ask me, the last thing that he ever said was “Son, why did you shoot me?” He voice [sic] wasn’t even mad, he was hurt, I hurt his feelings — you see? I wish I had that moment back because I want to be able to see that hurt in his eyes 10 times over and more. It went by too fast for me, baby. I wanted to explain to him that the way he feels I felt the same way when he beat me and when he rejected me as a son and when he continued to tell me that I’m a piece of shit or that I’m worthless. But when I had that gun on him he knew that I had all the power in this fight instead of the other way around. It felt good to have that power, baby. I [tortured] my sister that night but not [physically], but mentally. I was going to go back and kill her later but I didn’t get the chance because I got arrested. I still think about killing her, like if I was ever to get out or anything like that. She told my grandma who told my great aunt who told me that she wants me to put her down on my visit list so she can come see me. I’m thinking about putting her |sldown and then I think about ways I can kill her at visitation. But that’s probably a no go because then I wouldn’t get to ev&r see you so still got some things to work out. I think about killing my whole family, baby. Have you ever seen someone dead? I’m not talking about at a funeral, I’m talking about with blood everywhere. I shot my dad right in the top lip and nose. After he fell I shot my mom. I saw her fucking face come off. I shot her behind the ear and everything under her nose was blown off. The bone fragments from her jaw and teeth came off so fast and went back in her body in pieces that the DA thought that I shot her twice. She had those pieces go into her leg and side and into the bedpost that she clung to and into the wall across the room. I saw her fucking face on the floor with all of her blood. I wish I could have made that last longer, too. I wanted to look at her and tell her that nobody is going to save her and that there is nothing I could do and then I’ll say “But, I still love you. What? does that all sound familiar? I wonder who said those things?” I wish I could have fucked her up mentally before I killed her. So you see those sorts of things are the things that I think" about and those are the sort of things that bother me.... No — I don’t think I’m a bad person just because I’ve killed some animals. I have been killing animals since I got my first gun which was when I was 6. That kind of shit doesn’t bother me. I have killed all the animals you can think of, ... I have made dogs, cats, goats, it doesn’t matter, all suffer and I killed them all. I killed some with reason and others I killed because I felt like it.... I wanted to know how it felt to kill someone when I was about 14. I wanted to know that I’ll be able to kill my when the time comes [sic]. I [tortured] my cousin. I [strapped] him down in the workshed on a work table and I cut him a few times, I shot him with my bb gun. He cried and screamed. I [tortured] animals in front of him. I made his pet rabbit bleed on his stomach. He never said anything to anyone, well, as far *952 as I know. I told him that I would kill him.

. Because the defendant challenged the constitutionality of these provisions, the Louisiana Attorney General filed an appellate brief in their defense.

. The record indicates that the defendant— whose age was 15 years and eight month old at the time of the murders — was slightly under 6 feet tall and weighed approximately 220 pounds. Mr. Fletcher, who was 50 years old, weighed about 300 pounds and stood slightly taller than 6 feet. According to the defendant’s sister, their father had health issues due to diabetes and low back pain.

. Dr. Seiden characterized the defendant’s impulsive thoughts of suicide as being manipulative to get the attention of someone he felt was not paying enough attention to him. The record contained many examples of the defendant’s manipulative behavior. In particular, we note two letters written to the sentencing judge on the defendant’s behalf by a woman who worked in the office of his orthodontist. She recounted claims made to her by the defendant since his arrest, which were disproved at trial. Notably, in one of his letters from jail, the defendant reminded her of an occasion when she saw him with a broken collarbone which, at the time, he related to a dirtbike accident. He asserted in his letter that his father had actually inflicted the injury. However, during his interview with Dr. Seiden, the defendant candidly admitted that the two instances when he broke his collarbone were, in fact, accidents — once playing football, the other time in a motor vehicle accident.

. The defendant reported to Dr. Vigen that he felt better in jail after the murders than before because he had “gotten rid of all the negatives in my life.”

. Relevant excerpts from this eight-page, handwritten letter are reproduced in the appendix attached to this opinion. The defense stipulated to the report of the state’s handwriting expert verifying that the letter was written by defendant. We note that the letter, which was sent from Angola where the defendant was incarcerated, reveals that the defendant writes coherently in a very legible manner.

. See State v. Baker, supra, wherein parole eligibility was allowed by the trial court to a 16-year-old defendant whose woeful personal history — a "crack baby” who was, by the age of 14, "a ticking time bomb" with a significant, mitigating mental health history — closely mirrored those of the two defendants in Miller.

. These letters considered by the trial court were from close family members. In a sharp contrast to the usual situation where the defendant’s relatives plead for mercy on his behalf, all the requests in this case were that the maximum sentence be imposed.

. The defendant contends that "the effect on the victims’ families” should not be a valid basis for denial of parole eligibility. We strongly disagree. In the instant case, the victims' families are also the defendant’s family, and he has demonstrated that he continues to actively desire to harm them. Nothing in Miller prohibits the sentencing court from considering the devastating emotional trauma suffered by these relatives who continue to grieve for the murder victims and to fear for their own safety. Furthermore, La. C. Cr. P. art. 878.1 provides that the aggravating and mitigating evidence introduced at a Miller hearing may include "the offender’s.level of family support” and "such other factors as the court may deem relevant.” We agree with the trial court that one of the factors to be balanced in considering the defendant's potential for rehabilitation is the need to protect society from someone with the defendant’s destructive tendencies.

. The defendant fired the shotgun at his father's upper lip. His mother was killed by a shotgun blast that entered the right side of her head and exited the left side of her face. Exiting pellets also penetrated her torso and extremities.