ROSEMARY LEDET, Judge.
I Tin this criminal appeal, the defendant, Milton Wilson, seeks review of his sentence of.iife without benefit of parole, probation, or suspension of sentence for second degree murder. For the reasons that follow, we affirm his conviction and sentence.

STATEMENT OF THE CASE

On April 5, 2013, Milton Wilson, Jaroid Washington, and Erin Doucet were each charged by bill of indictment with one count of second degree murder, in violation of La. R.S. 14:30.1; armed robbery with a firearm, in violation of La. R.S. 14:64.3; criminal conspiracy to commit armed robbery, in violation of La. R.S. 14:64.3; and obstruction of justice, in violation of La. R.S. 14:30.1. On April 12, 2013, Mr. Wilson appeared for arraignment and entered a plea of not guilty.[1]
On June 6, 2013, Mr. Wilson filed a motion for discovery, a motion to suppress, and a motion to preserve evidence. On August 26, 2013, the district court denied the motion to suppress. On September 25, 2013, the district court granted Mr. Wilson’s and his co-defendants’ motion to sever their trials.
pThe district court held a competency hearing on April 29, 2014 and found Mr. Wilson competent to stand trial. On May 5, 2014, a jury was selected and trial commenced on the second degree murder charge only. On May 7, 2014, the trial concluded, and the jury found Mr. Wilson guilty of second degree murder.
On July 11, 2014, following Mr. Wilson’s conviction and the denial of his post-verdict motions, the district court conducted a sentencing hearing. At the conclusion of the sentencing hearing, the district court sentenced Mr. Wilson to life imprisonment without the benefit of probation, parole, or suspension of sentence.[2] Mr. Wilson objected to the sentence, and this appeal followed.

*1153
STATEMENT OF THE FACTS

On November 25, 2012, at approximately 1:40 a.m., Fernando Eyzaguirre, the victim, drove to Anytime Fitness, a twenty-four hour gym. After arriving at the gym, Mr. Eyzaguirre parked his vehicle. For about thirty minutes, he remained in his parked vehicle, talking and texting on his cell phone. While Mr. Eyzaguirre was sitting in his vehicle outside the gym, a trio — later identified as Milton Wilson, aka “Bullet;” Jaroid Washington, aka “Roy;” and Marke Simmons, aka “Fresh” — entered the parking lot on foot. The trio initially walked past Mr. Eyzaguirre’s vehicle, but then doubled back and headed toward Mr. Eyzaguirre’s vehicle.
One individual, later identified as Mr. Wilson, approached Mr. Eyzaguirre’s vehicle on the driver’s side.[3] As he neared the vehicle, Mr. Wilson pointed his gun, a revolver, at the victim while pulling on the driver’s side door. Then a second | ¡¿ndividual, identified as Mr. Washington, approached the passenger’s side of Mr. Eyzaguirre’s vehicle and attempted to open the door. At this time, the third individual, identified as Mr. Simmons, approached and stood at the rear of the vehicle. Mr. Washington then walked around to the driver’s side of the vehicle. Together, Mr. Washington and Mr. Wilson were able to remove Mr. Eyzaguirre from his vehicle.
As Mr. Eyzaguirre attempted to step away from his vehicle, the three individuals surrounded him and started shooting.[4] Both Mr. Wilson and Mr. Simmons had their weapons pointed at Mr. Eyzaguirre. As he was being shot multiple times and while trying to escape, Mr. Eyzaguirre turned and staggered parallel to the vehicle. With their weapons still extended, Mr. Wilson and Mr. Simmons followed Mr. Eyzaguirre as he stumbled and fell face first on the ground. Mr. Eyzaguirre was shot several more times while on the ground. Mr. Simmons and Mr. Washington entered Mr. Eyzaguirre’s vehicle. Mr. Wilson briefly remained standing over Mr. Eyzaguirre’s body with his gun still extended at the victim until he too entered Mr. Eyzaguirre’s vehicle, and all three drove away.
At approximately 6:26 a.m., the New Orleans Police Department (“NOPD”) received a phone call reporting the discovery of Mr. Eyzaguirre’s body. At trial, Shata-sha Johnson, NOPD’s 911 communications records custodian, testified that the call was made by Mark Lee and originated from 5163 General de Gaulle Drive in New Orleans, Louisiana.
|4Charlotte Wolfe, a paramedic for New Orleans EMS, testified that she was dispatched to the 5100 block of General de Gaulle Drive. When she arrived, she observed a white male lying face down on the ground with multiple gunshot wounds and significant amounts of blood. Ms. Wolfe testified that she did not attempt to resuscitate the victim because he appeared to have been dead for some time.
The lead investigator, Detective Tim Bender of the NOPD’s Homicide Division, testified that the homicide took place in the parking lot of a strip mall, which contained multiple businesses, including Anytime Fitness. At trial, Detective Bender identified photographs taken of the crime *1154 scene and of Mr. Eyzaguirre’s body. He estimated that Mr. Eyzaguirre was lying in the parking lot for approximately four hours before EMS had arrived. Detective Bender also identified bullet casings, which were 9-millimeter, and bullets found at the scene.
During the investigation, Detective Bender obtained surveillance videos from three businesses located in the strip mall: Subway,[5] Michelli’s Bar, and a third unnamed business located on the second floor. Upon viewing the videos, Detective Bender stated it was apparent that the motive of the homicide was robbery. All three videos were shown to the jury.
Milagro Eyzaguirre, the victim’s mother, testified that her son was twenty-seven years old at the time of his death. He was a student at Delgado and Southeastern University, studying computer technology, and was also employed. Mrs. Eyzaguirre testified that she last saw her son around 2:00 p.m. on November 24, 2012. The rest of the day he remained home, while she ran errands.
IsAt approximately 1:40 a.m. on November 25, 2012, Mrs. Eyzaguirre heard her son leave the house. She stated that, due to his busy schedule, it was not unusual for him to go to the gym at that hour. Later that morning, Mrs. Eyzaguirre noticed that Mr. Eyzaguirre had not returned home. Mrs. Eyzaguirre testified that she called, emailed, and texted him throughout the day, but she received no response. Eventually, the victim’s father called the police to report their son missing.
Detective Bender spoke with Sergeant Kevin Burns who was investigating the Eyzaguirres’ missing1 persons claim. Sergeant Burns believed that, based on the description the family provided, Mr. Eyza-guirre was the homicide victim. Detective Bender advised Mrs. Eyzaguirre that a man had been shot on General de Gaulle. After viewing pictures of the shooting victim at the coroner’s office, Mr. Eyzaguirre, the victim’s father, identified the shooting victim as his son.
Following the victim identification, Detective Bender obtained the make, model, and license plate number of Mr. Eyza-guirre’s vehicle. The vehicle information and the license plate number were entered into the automated license plate recognition system.
Mr. Eyzaguirre’s vehicle was eventually found in Waveland, Mississippi. The car was towed to New Orleans and secured at police headquarters. A search of the vehicle revealed three compact music discs and a baseball cap with a Dead Line logo depicting the outline of a body at a homicide scene. The police found Mr. Simmons’ DNA on the baseball cap and on the radio face plate of Mr. Eyzaguirre’s vehicle. Mr. Simmons was subsequently arrested.
Detective Bender sought to find the connection between the homicide in New Orleans and the victim’s vehicle in Waveland. Concurrently, Faye Richard, |fiMr. Washington’s grandmother, informed the police that her daughter lived in Waveland around the corner from where the police found the victim’s vehicle, and that her daughter was suspicious about the vehicle. Detective Bender spoke with Mr. Washington’s grandmother and mother and learned that Mr. Washington had a friend named Marke Simmons who went by the nickname “Fresh.” Detective Bender thereafter obtained a statement from Mr. Washington, who informed the detective that Mr. Washington, “Fresh,” “Bullet”[6] *1155 and “E,”[7] were involved in the crime.
After further investigation, Detective Bender obtained an arrest warrant for.Mr. Wilson. Mr. Wilson was arrested in New Orleans East. After he was arrested and advised of his Miranda rights, Mr. Wilson voluntarily made a statement, which was played for the jury at trial. Detective Bender testified that during the statement, Mr. Wilson admitted that he was armed with a revolver during the time of the murder, but he claimed that he threw the weapon in a drainage canal afterwards. Even though Mr. Wilson indicated on a Google map where he threw his weapon, the police were unable to recover it.[8] The police were also unable to recover the 9-millimeter weapon allegedly used by Mr. Simmons.
At trial, Detective Bender testified that seven 9-millimeter casings were found on the scene and four projectiles of 38-caliber were recovered. He stated that a 9-mil-limeter round is also classified as a 38-caliber bullet.[9] Detective Bender |7testified, based on his recollection, that he believed the ballistics report indicated that all the casings that were found- were fired from the same 9-millimeter weapon. Detective Bender also stated that the ballistics report indicated that the testable projectiles — those which were not deformed or fragmented — came from the same 9-millimeter handgun. He testified, however, that a 38-caliber bullet could be fired from a revolver. He further testified that because some of the bullets were deformed, it could not definitively be determined that only one weapon was used.
Although, the State called Mr. Washington to the stand, he refused to testify citing personal safety concerns.
Dr. Samantha Huber, an expert in the field of forensic pathology and chief forensic pathologist of Orleans Parish, performed the autopsy of Mr. Eyzaguirre’s body. Dr. Huber testified that that Mr. Eyzaguirre had seven gunshot wounds. She stated that Mr. Eyzaguirre also had abrasions and bruises on his body from falling on his face and knees. According to her testimony, two gunshot wounds occurred when Mr. Eyzaguirre was lying on the ground. Although one bullet passed through the carotid artery and the jugular vein caused an excessive amount of bleeding, Dr. Huber opined that it was a combination of all the gunshots that caused Mr. Eyzaguirre’s death. She further opined that Mr. Eyzaguirre remained conscious for ten to fifteen seconds before bleeding out to death.

DISCUSSION

Errors Patent

A review of the record for errors patent reveals none.

Assignment of Error Number 1

■ As his first assignment of error, Mr. Wilson contends that the district court erred in sentencing him to life imprisonment without the possibility of parole [¿without conducting any inquiry into his character and potential for rehabilitation *1156 as mandated by Miller v. Alabama, 567 U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).
The State contends that this assignment of error was waived on appeal and is without merit. According to La.C.Cr.P. Art. 841, the State contends, Mr. Wilson waived his right to appeal the form of the sentencing hearing becausé he only objected to the sentence, and not the manner in which the hearing was conducted. However, the record reflects that, at the conclusion of Mr. Wilson’s final sentencing proceeding, following the court’s rendering of sentence, his attorney noted his objection on the record and advised the district court of his intention to file an appeal. We therefore find the State’s arguments lack merit.
In Miller, the United States Supreme Court held that the Eighth Amendment of the United States Constitution prohibits mandatory life sentences without the possibility of parole for offenders convicted of homicide who were under the age of eighteen at the time of the offense. 132 S.Ct. at 2469. The Supreme Court did not categorically bar sentencing juveniles to life without parole; instead, the Supreme Court required that a sentencing court hold a hearing to consider an offender’s youth and attendant characteristics as mitigating circumstances before deciding whether it will impose the harshest possible sentence on a juvenile offender, otherwise known as a Miller hearing. See State v. Tate, 12-2763 (La.11/5/13), 130 So.3d 829, 833, cert. denied, — U.S. -, 134 S.Ct. 2663,189 L.Ed.2d 214 (2014).
In mandating a Miller hearing before sentencing a juvenile to life without parole, the United States Supreme Court relied on its reasoning in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) [10] and Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).[11] Specifically, the Miller Court reasoned:
Roper and Graham establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, “they are less deserving of the most severe punishments.” Graham, 560 U.S., at [68], 130 S.Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a “ ‘lack of maturity and an underdeveloped sense of responsibility,” ’ leading to recklessness, impul-sivity, and heedless risk-taking. Roper, 543 U.S., at 569, 125 S.Ct. 1183. Second, children “are more vulnerable ... to negative influences and outside pressures,” including from their family and peers; they have limited “contro[l] over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievable] depravity].” Id., at 570, 125 S.Ct. 1183.
Miller, 132 S.Ct. at 2464.
Similarly, the Miller Court held that a mandatory sentence precludes consideration of such differences between a juvenile and an adult. Under this penalty scheme, a sentencing court is prevented from taking into account the juvenile offender’s family and home environment. Miller, 132 S.Ct. at 2468. “It neglects the circumstances of the homicide offense, in- *1157 eluding the extent of his participation in the conduct and the way familial and peer pressures may have affected him.... And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.” Id. Mandatory sentences ignore the element of youth and subject a juvenile to the same life-without-parole sentence applicable to an adult. Miller, 132 S.Ct. at 2466. This [^scheme “contravenes Graham’s (and also Roper’s) foundational principle: that imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.” Miller, 132 S.Ct. at 2458. In likening sentencing a juvenile to life imprisonment to sentencing an adult to death, the Supreme Court stated that mandatory life without parole without individualized sentencing violates the principle of proportionality and the Eighth Amendment’s ban on cruel and unusual punishment. Miller, 132 S.Ct. at 2466, 2475.
In Miller, the Supreme Court stated that Graham’s treatment of juvenile life sentences without parole as analogous to capital punishment did make “relevant ... [United States Supreme Court’s] precedent demanding individualized sentences when imposing the death penalty.” Miller, 132 S.Ct. at 2467. The Miller Court further stated regarding a mandatory death sentence for first-degree murder:
We thought the mandatory scheme flawed because it gave no significance to “the character and record of the individual offender or the circumstances” of the offense, and “exclud[ed] from consideration ... the possibility of compassionate or mitigating factors.” [Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ]. Subsequent decisions have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses. See, e.g., Sumner v. Shuman, 483 U.S. 66, 74-76, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); Eddings v. Oklahoma, 455 U.S. 104, 110-112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett, 438 U.S. at 597-609, 98 S.Ct. 2954 (plurality opinion).

Id.

Furthermore, the Supreme Court specifically noted that in its prior rulings, it insisted that a sentencer have the ability to consider the “mitigating qualities of youth.” Id. (citing Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). The Miller Court further stated:
| t Everything we said in Roper and Graham about that stage of life also appears in these decisions. As we observed, “youth is more than a chronological fact.” Eddings [v. Oklahoma ], 455 U.S. [104], 115, 102 S.Ct. 869, [71 L.Ed.2d 1 (1982)]. It is a time of immaturity, irresponsibility, “impetuousness[,] and recklessness.” Johnson [v. Texas], 509 U.S. [350], 368, 113 S.Ct. 2658, [125 L.Ed.2d 290 (1993)]. It is a moment and “condition of life when a person may be most susceptible to influence and to psychological damage.” Eddings, 455 U.S., at 115, 102 S.Ct. 869. And its “signature qualities” are all “transient.” Johnson, 509 U.S., at 368, 113 S.Ct. 2658.
Miller, 132 S.Ct. at 2467. The Supreme Court stated that considering Graham’s reasoning, the jurisprudence demonstrates the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. In addition, the Supreme Court in Miller found that:
*1158 Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other — the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from á stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses — but really, as Graham noted, a greater sentence than those adults will serve. In meting out the death penalty, the elision of all these differences would be strictly forbidden. And once again, Graham indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.
So Graham and Roper and our individualized sentencing cases alike teach that in imposing a State’s harshest penalties, a sentencer misses too much if he treats every child as an adult, [footnotes omitted].
Miller, 132 S.Ct. at 2467-68.
In accordance with the principles explained in Roper and Graham, the Supreme Court in Miller held:
[T]hat the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. Graham, 560 U.S., at [75], 130 S.Ct., at 2030 (“A State is not required to guarantee eventual freedom,” but must provide “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation”). By making youth (and all | iathat accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [the defendants’] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between “the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Roper, 543 U.S., at 573, 125 S.Ct. 1183; Graham, 560 U.S., at [68], 130 S.Ct., at 2026-2027. Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.
Miller, 132 S.Ct. at 2469. The Supreme Court in Miller specifically stated “[o]ur decision does not categorically bar a penalty for a class of offenders or type of crime — as, for example, we did in Roper or Graham. Instead, it mandates only that a sentencer follow a certain process — considering an offender’s youth and attendant characteristics — before imposing a particular penalty.” Miller, 132 S.Ct. at 2471.
In order to comply with the Supreme Court’s ruling in Miller, the Louisiana legislature enacted La.C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E). See Acts 2013, No. 239, effective August 1, 2014. See also State v. Tate, 12-2763 (La.11/5/13), 130 *1159 So.3d 829. Addressing whether a juvenile offender’s life sentence should be imposed with or without parole, La.C.Cr.P. art. 878.1 states the following:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior to sentencing to determine whether |iathe sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).[12]
B. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender’s level of family support, social history, and such other factors as the court may deem relevant. 114Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
Conversely, La. R.S. 15:574.4(E) applies only if the juvenile offender is sentenced to life imprisonment with the benefit of parole.
Louisiana courts have since interpreted and applied both Miller and the enacted legislation codifying the principles rendered in Miller. See State v. Brown, 12-0872, p. 6 (La.5/7/13), 118 So.3d 332, 335 *1160 (stating that the Miller holding permits the imposition of a life sentence without parole but only after an opportunity to consider mitigating circumstances); State v. Baker, 14-0222, p. 7 (La.App. 1 Cir. 9/19/14), 154 So.3d 561, 566 (stating that Miller’s, sole holding was to prohibit a ‘sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders’ without first considering certain attendant and mitigating characteristics”); State v. Brooks, 49,033, pp. 6-7 (La.App. 2 Cir. 5/7/14), 139 So.3d 571, 576, writ denied, 14-1194 (La.2/13/15), 159 So.3d 459 (finding that Miller does not create a categorical bar against life without benefit of parole for juveniles, “but a sentencing court must first consider an offender’s youth and attendant characteristics as mitigating circumstances before determining whether to impose the harshest possible penalty for a juvenile offender”). The Louisiana Supreme Court held that Miller did not apply retroactively to those defendants whose underlying convictions and sentences are final. State v. Tate, 12-2763, p. 17 (La.11/5/13), 130 So.3d 829, 841, reh’g denied (Jan. 27, 2014), cert. denied, — U.S. -, 134 S.Ct. 2663, 189 L.Ed.2d 214 (2014). The Louisiana Supreme Court in Tate also held that the newly-enacted legislation, La.C.Cr.P. art. 878.1 and R.S. 15:574.4(E)(1), applies prospectively only. Id., 12-2763, pp. 20-21, 130 So.3d at 844.
11sIn State v. Smoot, 13-453 (La.App. 5 Cir. 1/15/14), 134 So.3d 1, writ denied, 14-0297 (La.9/12/14), 147 So.3d 704, the defendant, seventeen years old, was found guilty of second-degree murder. During the sentencing hearing, the district court stated that, in accordance with Miller, it considered the defendant’s youth and previous criminal activity. Smoot, 13-453 at p. 10, 134 So.3d at 6. The district court also took into account that the victim, an elderly homeless HIV positive crack addict, was shot multiple times in the front and back by the juvenile defendant who was involved in the drug trade, had a prior conviction for distribution of cocaine, and shot the victim over a stereo. The district court sentenced defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. After the district court denied the defendant’s motion to reconsider sentence, the defendant appealed. Smoot, 13-453 at pp. 9-11, 134 So.3d at 5-6. The appellate court found that the district court clearly complied with the sentencing directives set forth in Miller and affirmed the defendant’s conviction and sentence. Smoot, 13-453 at p. 9,134 So.3d 1, 5.
In Brooks, supra, the defendant, seventeen years old, was convicted of second degree murder and sentenced to life without parole for participating in a gunfight, which resulted in the death of an innocent fifteen-year-old bystander. The appellate court vacated the mandatory sentencing of life imprisonment in light of Miller, and remanded to the district court for a sentencing hearing pursuant to La.C.Cr.P. art. 878.1. On remand, the sentencing judge ordered the parties to submit a pre-sentence investigation report (“PSI”), which described the defendant’s family history and juvenile criminal record.[13] Brooks, 49,033 at p. 1, 139 So.3d at 572-73. | -i fAfter the district court held the Miller hearing and heard testimony from the defendant and his family members, the district court imposed the same sentence— life without parole — and the defendant appealed. The appellate court affirmed the *1161 sentence, stating that the district court properly held a sentencing hearing pursuant to Miller and La.C.Cr.P. art. 878.1. Brooks, 49,038 at pp. 6-8, 139 So.3d at 575-78.
In State v. Fletcher, 49,303 (La.App. 2 Cir. 10/1/14), 149 So.3d 934, the juvenile defendant, who was fifteen years and eight months old at the time, shot both of his parents in their faces, killing them instantly. The defendant was convicted of two counts of second degree murder and received two concurrent mandatory life sentences. Fletcher, 49,303 at p. 1, 149 So.3d at 936. The appellate court vacated the mandatory sentences and remanded to the district court for a sentencing hearing pursuant to La.C.Cr.P. art. 878.1 and Miller. At the Miller hearing, the district court heard testimony that the defendant had a history of torturing animals, criminal activity, and violence; and he still expressed a desire to kill his sister. The district court also heard that the defendant was evaluated by a psychiatrist, who opined that there was an increased risk of future violent behavior and that the defendant suffered from antisocial personality disorder or psychopathy. Fletcher, 49,303 at pp. 24-25, 149 So.3d at 947-48. At the conclusion of the hearing, the district court imposed the same sentence — life without parole — and the defendant appealed. The defendant, in part, challenged the constitutionality of La. R.S. 14:30.1, La. R.S. 15:574.4(E), and La.C.Cr.P. art. 878.1 and argued the sentence was unconstitutionally excessive. The appellate court upheld the Louisiana statutes as constitutional and found that the sentences 117imposed were not constitutionally excessive. Fletcher, 49,303 at pp. 12-13, 28,149 So.3d at 942, 950.
In this case, Mr. Wilson seeks review of his sentence of life imprisonment without parole imposed on July 11, 2014, after a sentencing hearing was held. The gist of Mr. Wilson’s contention is that the district court failed to hold a proper Miller hearing. He contends that Miller set forth minimum requirements for the district court to consider — such as the defendant’s youth and immaturity, the impact of peer pressure on the defendant, and the circumstances of the offense — and that the district court erred by failing to reference these factors when handing down his sentence. According to Mr. Wilson, the district court should have further inquired into his character when defense counsel failed to produce evidence regarding his parental guidance and status in school.
We find Mr. Wilson’s arguments unpersuasive. At Mr. Wilson’s sentencing hearing, the district court complied with the sentencing directives set forth in Miller and La.C.Cr.P. art. 878.1. Both Mr. Wilson and his older sister, Tywanda Wilson, testified at the sentencing hearing. Mr. Wilson read a prepared letter to Mr. Eyza-guirre’s family and to the district court, in which he expressed remorse for his crime. Mr. Wilson also maintained that he neither shot nor killed Mr. Eyzaguirre, but he acknowledged his role in the commission of “this senseless crime.”
As to Mr. Wilson’s family and home environment, his sister testified that their mother was not a caregiver. Instead, Mr. Wilson’s aunt obtained custody of him, and his sister helped raise and support him. Additionally, his sister stated that, in 2012, Mr. Wilson was sent to live with his seventy-four year old grandfather. During her testimony, she recounted her brother as' a good person, who went to school, played football, and loved his nieces and nephew.
11sThe State offered the testimony of the Eyzaguirre family and victim impact letters from Mr. Simmons’ sentencing hearing.[14] The State asked that the district *1162 court also consider the heinousness of the crime. At all times during commission of the crime, Mr. Wilson had a gun pointed at Mr. Eyzaguirre — while Mr. Eyzaguirre was sitting in his vehicle, when Mr. Eyza-guirre was removed from his vehicle, and while Mr. Eyzaguirre was on the ground bleeding. Because of Mr. Wilson’s actions and the testimony of Mr. Eyzaguirre’s family, the State requested that the court sentence Mr. Wilson to life imprisonment without benefit of probation, parole, or suspension of sentence.
Counsel for Mr. Wilson noted that, according to Miller, a heightened level of scrutiny is required when sentencing a juvenile. Mr. Wilson’s counsel then asked that the district court consider the following factors: Mr. Wilson’s age, his acceptance of responsibility, and his family situation. Defense counsel explained that he intended to have several of Mr. Wilson’s family members speak at the hearing,[15] and their lack of support evidenced Mr. Wilson’s poor home environment.
In the present case, the district court complied with the principles set forth in Miller and codified in La.C.Cr.P. art. 878.1. After hearing from both sides, the district court articulated its considerations before imposing the life sentence without parole on Mr. Wilson. The district court stated:
|19Mr. Wilson, I do appreciate the fact that you have shown remorse today. I think it was an important step toward the healing process for the Eyzaguirre family.
And taking into account your age at the time of the offense, I must now refer to Code of Criminal Procedure, Article 878.1. We’ve had our hearing. And I understand that you were a juvenile at the time of the offense.
But I also understand that you were old enough to recognize the actions that you took at that time. In particular, the most glaring portion of that video, when it impacts your actions, was what you chose to do after Mr. Eyzaguirre was on the ground bleeding, having already been shot in the face and having already been shot in the back.
Those few seconds when you stood over his dying body spoke volumes about what your state of mind was at that time.
And on that basis, despite the fact that you are remorseful, I find you do fall into the category of one of the worst offenders of one of the worst offenses.
And as a result of that determination, I am sentencing you to life imprisonment without benefit of probation, parole, or suspension of sentence.
Thus, the district court considered mitigating factors, specifically identifying Mr. Wilson’s youth and remorse, before imposing the sentence.
Mr. Wilson contends that the foregoing was insufficient as Miller set forth specific factors that the sentencing judge should, at a minimum, consider but did not in this case.[16] Mr. Wilson argues that by not *1163 referencing all the Miller factors on the record, the district judge failed to appropriately consider all Mr. Wilson’s | ¡^character and background, but instead only focused on the crime itself and Mr. Wilson’s participation in it. More specifically, Mr. Wilson contends that the court did not consider the lack of parental guidance, his placement in special education classes, and the impact of peer pressure on him.
Contrary to Mr. Wilson’s contentions, Miller does not require the sentencing court to articulate all mitigating factors on the record. Rather, Miller simply “mandates a hearing at which youth-related mitigating factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility.” Fletcher, 49,303 at p. 15, 149 So.3d at 943 (finding that the provisions of La.C.Cr.P. art. 878.1 mandating a sentencing hearing at which the defense will be given an opportunity to present mitigating factors — which include the defendant’s age as an important part of his social history — satisfy Miller’s requirement that mitigating factors favoring a juvenile killer be heard in a proceeding held for that purpose, p. 12, 149 So.3d at 942). As Louisiana jurisprudence demonstrates, sentencing judges consider a variety of aggravating and mitigating factors before sentencing a juvenile defendant. Smoot, supra• Brooks, supra', Fletcher, supra. However, neither Louisiana jurisprudence nor Louisiana statutory law require articulation of all aggravating and mitigating factors on the record. See Fletcher, 49,303 at 15-16,149 So.3d at 943-44 (stating that in determining the exces-siveness of a sentence, “[t]he trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines ’ of the [La. C. Cr. P. art. 894.1].”).
|21In the present matter, the district court articulated what it considered to be important factors pertaining to the defendant’s brutal crimes. As discussed, before sentencing Mr. Wilson, the district court held a hearing at which testimony was presented regarding Mr. Wilson’s youth and unstable home environment. Although not raised at the sentencing hearing, the record reflects that Mr. Wilson was in special education classes while in school. Specifically, the report of Dr. Rafael Salcedo,[17] a forensic psychologist, states that the reason the school placed Mr. Wilson in special education classes under an “Emotionally Disturbed” classification was because of an “extensive history of behavior problems.”[18] Dr. Salcedo’s report also notes that Mr. Wilson’s school records indicate academic underachieve *1164 ment and a chronic problem of unexcused absences. Nevertheless, Dr. Salcedo opined that Mr. Wilson did not “manifest[ ] any signs or symptoms of a major psychiatric disorder,” and he was old enough to understand and recognize the actions that he took the night of the incident. Thus, Dr. Salcedo found Mr. Wilson competent to proceed to trial. Given that the same district court judge presided over Mr. Wilson’s competency hearing, trial, and sentencing, the record reflects that the district court judge was aware of these facts before the sentencing hearing.
Furthermore, Mr. Wilson’s contention that the district court failed to consider the impact of peer pressure is misguided. In his statement to the police and during his testimony at the sentencing hearing, Mr. Wilson never mentioned l^that he was intimidated or pressured by anyone — neither Mr. Simmons nor Mr. Washington.[19] In fact, Mr. Wilson was the first person to walk up to Mr. Eyzaguirre’s vehicle and point a gun at him. After Mr. Eyzaguirre was forced put of his vehicle, both Mr. Wilson and Mr. Simmons continued to point their guns at Mr. Eyzaguirre, following him with weapons raised as he tried to leave. Mr. Eyzaguirre sustained multiple gunshot wounds[20] and fell to the ground. For a few seconds thereafter, Mr. Wilson stood over Mr. Eyzaguirre’s body while Mr. Simmons and Mr. Washington got into Mr. Eyzaguirre’s vehicle. Additionally, Mr. Washington refused to testify at Mr. Wilson’s trial, citing concerns for his safety. However, in his statement to police and his testimony at his Boykin hearing, Mr. Washington stated that he saw both Mr. Wilson and Mr. Simmons shoot the victim, Mr. Eyzaguirre. Considering the testimony of both Mr. Washington and Mr. Wilson, as well as Mr. Wilson’s actions during the commission of the crime, the district coürt was familiar with the dynamics between the trio, even though the district court did not explicitly state so on the' record at the Miller hearing.
As discussed above, the district court complied with the principles set forth in Miller and -codified in La.C.Cr.P. art. 878.1. Neither Miller nor article 878.1 contains a specific list that a sentencing court must consider. Additionally, Miller and its progeny, including La.C.Cr.P. art. 878.1, -do not require that a sentencing court state on the record all the mitigating factors it considered. Before sentencing Mr. Wilson, the district court allowed the prosecution and the defense to introduce l^any aggravating and mitigating evidence. The district court considered Mr. Wilson’s youth, heard the testimony from his sister about his home environment, and learned of his troubles in school at his competency hearing. Yet the district court, after considering these factors, sentenced Mr. Wilson to life imprisonment without benefit of probation, parole, or suspension of sentence. In doing so, the district court specifically found that Mr. Wilson fell “into the category of one of the worst offenders of one of the worse offenses.” See La. C.Cr.P. art. 878.1 (stating that sentences “imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases”).
Accordingly, this assignment of error lacks merit.

Assignment of Error Number 2

In his second assignment of error, Mr. Wilson contends that his life sentence *1165 without parole violates the Eighth Amendment of the United States Constitution and Louisiana. Constitution Art. I, § 20 and was arbitrarily imposed without recourse to objective standards.
Both the Eighth Amendment of the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of cruel and unusual punishment. Additionally, the Louisiana Constitution explicitly prohibits “excessive” punishment.[21] La. Const, art. I, § 20.
The scope and authority of an appellate court’s power to upset a district court’s sentence is set forth in La.C.Cr.P. art. 881.4. An appellate court shall not 1 j>4set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D). State v. Jasper, 14-0125, p. 19 (La.App. 4 Cir. 9/17/14, 19), 149 So.3d 1239, 1252 (citing State v. Robinson, 11-0066, p. 17 (La.App. 4 Cir. 12/7/11), 81 So.3d 90, 99). On appellate review of an excessive sentence claim, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. Jasper, supra (citing State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462). Because a district court has broad discretion when imposing a sentence, a reviewing court may not set a sentence aside absent a manifest abuse of discretion. Jasper, supra (citing State v. Cann, 471 So.2d 701, 703 (La.1985)).
In determining the excessiveness of a sentence, the test employed by appellate courts is two-pronged. First, it must be determined whether the district court adequately complied with the statutory sentencing guidelines set forth in La. C.Cr.P. art. 894.1. Jasper, 14-0125 at p. 19, 149 So.3d at 1252 (citing State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Black, 98-0457, p. 8 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 891); see also Fletcher, 49,303 at p. 15, 149 So.3d at 936. The language of article 894.1 does not require rigid or mechanical compliance with its provisions. Instead it provides general guidelines and ensures some articulation of the factual basis for any given sentence. The district court judge “is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.” Fletcher, 49,303 at pp. 15-16, 149 So.3d at 943-44 (citing State v. Williams, 48,525 (La.App. 2 Cir. 11/20/13), 128 So.3d 1250). Furthermore, when the record shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full ^Incompliance with article 894.1. Jasper, supra (citing State v. Landos, 419 So.2d 475, 478 (La.1982); State v. Davis, 448 So.2d 645, 653 (La.1984) (the district court need not recite the entire checklist of article 894.1, but the record must reflect that it adequately considered the guidelines)).
Second, it must be determined “whether the sentence imposed is too severe in light of the particular defendant and the particular circumstances of the case, ‘keeping in mind that maximum sentences should be reserved for the most *1166 egregious violators of the offense so charged.’” Jasper, supra (quoting State v. Landry, 03-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239). In discussing the standard for evaluating a claim of excessive sentence, this court has previously held that a sentence may be reviewed for constitutional excessiveness even though it is within statutory limits. State v. Hackett, 13-0178, p. 14 (La.App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174, writ denied, 13-2122 (La.5/2/14), 138 So.3d 1238 (citing State v. Sepulvado, 367 So.2d 762, 767 (La.1979)). In Hackett, this court reasoned:
A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
13-0178 at p. 14, 122 So.3d at 1174 (quoting State v. Smith, 01-2574, pp. 6-7 (La.1/14/03), 839 So.2d 1, 4). A district court abuses its discretion only when it contravenes the constitutional prohibition of excessive punishment set forth in La. hfjConst. art. I, § 20, which prohibits “punishment disproportionate to the offense.” State v. Wilson, 11-0960, pp. 10-11 (La.App. 4 Cir. 9/5/12), 99 So.3d 1067, 1074, writ denied 12-2255 (La.3/8/13), 109 So.3d 358 (citing State v. Colvin, 11-1040, p. 7 (La.3/13/12), 85 So.3d 663, 668). In making that determination, the appellate court “must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.” Wilson, 11-0960, p. 9, 99 So.3d 1067, 1073 (citing Colvin, 2011-1040, p. 7 (La.3/13/12), 85 So.3d at 668; State v. Bonanno, 384 So.2d 355, 358 (La.1980)).
Mr. Wilson claims that because Graham and Miller viewed life without parole for juveniles as akin to the death penalty, this court must look to death penalty jurisprudence to determine the constitutionality of his sentence. To further support his position that the sentence imposed is unconstitutional, Mr. Wilson relies on Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980),[22] and Furman v. Geor *1167 gia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[23]
| ¡,7In Godfrey, tbe United States Supreme Court held that the failure to apply a limited construction of the aggravating circumstances was unconstitutional:
[T]he Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was “outrageously or wantonly vile, horrible and inhuman.” There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as “outrageously or wantonly vile, horrible and inhuman.” Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge’s sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)’s terms. In fact, the jury’s interpretation of § (b)(7) can only be the subject of sheer speculation.
Godfrey, 446 U.S. at 428-29,100 S.Ct. 1759 (footnote omitted). As a result of the vague construction applied, the United States Supreme Court concluded that there was “no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not.” Id. at 433, 100 S.Ct. 1759. In Godfrey, the Supreme Court noted that nothing in the record suggested that the defendant committed an aggravated battery upon his wife or mother-in-law before their deaths, and the murders did not involve torture as required by statute. The United States Supreme Court rejected the submission that a particular set of facts surrounding a murder, however shocking, were enough in themselves, and without some narrowing principle to apply to those' facts, to warrant the imposition of the death penalty.
Mr. Wilson argues that the instant matter is similar to Godfrey. He claims that the district court’s observation of Mr. Wilson standing over the victim’s body, when whether Mr. Wilson fired the gun is disputed, is not sufficiently narrow to _J_ggallow the imposition of a life sentence. However, unlike the Georgia statute applicable to the death penalty in Godfrey, La. C.Cr.P. art. 878.1, only mandates that the district court consider aggravating and mitigating evidence regarding the defendant’s crime and character in determining whether the sentence will be life with or without parole. Furthermore, as discussed above, the Supreme Court in Miller found the death penalty cases pertinent, because they require “sentencing authorities [to] consider the characteristics of a defendant and the details of his offense before sentencing him to death.” Miller, 132 S.Ct. at 2463-2464. Thus, under Miller, the sentencing court must take into consideration an offender’s age and associated circumstances before imposing life-without-parole.
In addition, Mr. Wilson contends that without utilizing objective criteria before sentencing him to life without parole, the district judge violated the premise grounded in the Eight Amendment that an irrevo *1168 cable sentence should not be imposed arbitrarily or capriciously.
A life sentence without the benefit of parole, probation, or suspension of sentence for a juvenile defendant convicted of second degree murder is authorized by La. R.S. 14:30.1(B). Other Louisiana courts’ have upheld life sentences without the possibility of parole for a juvenile. See Smoot, supra (seventeen-year-old defendant was found guilty of second-degree murder and sentenced to life without parole); Brooks, supra (seventeen-year-old defendant was convicted of second degree murder and sentenced to life without parole); Fletcher, 'supra (defendant, convicted of second degree murder, was fifteen years and eight months old when he killed both his parents and was sentenced to life without parole).
As discussed above, the record reflects that the district court considered a variety of factors before sentencing Mr. Wilson to life without parole, contrary toJ^Mr. Wilson’s assertions that the district court relied solely on the events of the crime in sentencing him. At the sentencing hearing, the district court observed that Mr. Wilson was seventeen years old at the time of the crime, Mr. Wilson’s sister stated that he was good and loving person that had a difficult upbringing, and Mr. Wilson’s statement that he was remorseful for the crime. Nevertheless, the district court found that Mr. Wilson understood the consequences of his action and noted that he “stood over” the victim’s dying body after he had already been shot in the face and back. Moreover, the victim impact statement from the Eyzaguirres family members, offered by the State, described the type of a person Mr. Eyzaguirre was and portrayed how deeply they were affected by his death. The videos of the crime show that Mr. Wilson was the first person of the group to approach Mr. Eyzaguirre and point a gun towards him. The videos also show that Mr. Wilson was the last to leave Mr. Eyzaguirre’s body and that he did not lower his weapon until he entered Mr. Eyzaguirre’s vehicle and fled.
Considering the district court’s broad discretion, the circumstances surrounding the crime, and the mitigating and aggravating evidence in the record, a life sentence without parole is not grossly out of proportion to the seriousness of the crime of second degree murder such that it shocks the sense of justice despite that Mr. Wilson was seventeen at the time he committed the offense. Mr. Wilson’s sentence is not a purposeless and needless infliction of pain and suffering. Accordingly, Mr. Wilson’s sentence does not violate the prohibitions against excessive, cruel, or unusual punishment set forth in the United States and Louisiana Constitutions. This assignment of error lacks merit.
1 ^DECREE
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. Although there were multiple charges, the minute entry reflects one plea of guilty.

. After sentencing, the State entered a nolle prosequi as to the remaining three charges against Mr. Wilson — armed robbery with a firearm, criminal conspiracy to commit armed robbery, and obstruction of justice.

. At trial, the State and defense counsel stipulated that Mr. Wilson was one of the individuals approaching the vehicle.

. One of the surveillance videos submitted into evidence by the State shows Mr. Simmons raising his hand at Mr. Eyzaguirre and, immediately thereafter, a flash of light appears. In addition, Detective Bender testified that he believed the first shot was fired by Mr. Simmons.

. According to Detective Bender, the surveillance video from Subway is one hour off.

. Mr. Washington advised that Mr. Wilson went by the nickname "Bullet.”

. On November 25, 2012, Erin Doucet, aka "E,” was driving around with the trio as passengers and dropped the trio off near the Anytime Fitness parking lot. However, Mr. Doucet did not approach Mr. Eyzaguirre’s vehicle.

. An unmanned submersible submarine was used to search for the weapon, because the canal contained a lot of rebar and concrete therein, and it was unsafe for divers to enter the water.

. Detective Bender neither authored the ballistics report nor testified as a ballistics expert.

. In Roper, the Supreme Court categorically banned capital punishment for juvenile offenders.

. In Graham, the Supreme Court prohibited life imprisonment without parole sentences for non-homicide juvenile offenders.

. La. R.S. 15:574.4(E) provides:
(1)Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1 and all of the following conditions have been met:
(a) The offender has served thirty-five years of the sentence imposed.
(b) The offender has not committed any major disciplinary offenses in the twelve consecutive months prior to the parole hearing date. A major disciplinary offense' is an offense identified as a Schedule B offense by the Department of Public Safety and Corrections in the Disciplinary Rules and Procedures for Adult Offenders.
(c) The offender has completed the mandatory minimum of one hundred hours of prerelease programming in accordance with R.S. 15:827.1.
(d) The offender has completed substance abuse treatment as applicable.
(e) The offender has obtained a GED certification, unless the offender has previously obtained a high school diploma or is deemed by a certified educator as being incapable of obtaining a GED certification due to a learning disability. If the offender is deemed incapable of obtaining a GED certification, the offender shall complete at least one of the following:
(1) A literacy program.
(ii) An adult basic education program.
(iii) A job skills training program.
(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections.
(g) The offender has completed a reentry program to be determined by the Department of Public Safety and Corrections.
(2) For each offender eligible for parole consideration pursuant to the provisions of this Subsection, the board shall meet in a three-member panel, and each member of the panel shall be provided with and shall consider a written evaluation of the offender by a person who has expertise in adolescent brain development and behavior and any other relevant evidence pertaining to the offender.
(3) The panel shall render specific findings of fact in support of its decision.

. The judge presiding over the sentencing hearing was not the same judge who presided over defendant's trial.

. After noting Mr. Wilson’s presence during Mr. Simmon’s sentencing hearing, the State moved to adopt the testimony and letters of the Eyzaguirre family from Mr. Simmon’s *1162 hearing into the record for Mr. Wilson’s sentencing hearing. Letters from various family members of Mr. Eyzaguirre are contained in the record in this case, but the record is devoid of any testimony from Mr. Simmon's sentencing hearing.

. Mr. Wilson testified at the hearing that his aunt and sister attended the hearing to support him. However, Mr. Wilson's sister, Ty-wanda Wilson, was the only relative to testily on his behalf.

. In his brief, Mr. Wilson claims the following:
Miller set[] forth specific factors that the sentencing judge, at a minimum, should consider: (l) the juvenile's “chronological age’’ and related "immaturity, impetuosity, *1163 and failure to appreciate risks and consequences;” (2) the juvenile’s "family and home environment that surrounds him;” (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him;" (4) the "incompetencies associated with youth” in dealing with law enforcement and a criminal justice system designed for adults; and (5) "the possibility of rehabilitation.” Miller, 132 S.Ct. at 2468.

. At the April 29, 2014 hearing to determine Mr. Wilson’s competency, Dr. Salcedo's report was considered by the district court. The minute entry therefrom provides that Dr. Richard Richoux testified, and Dr. Salcedo’s report was filed into the record. The parties stipulated that had Dr. Salcedo have been called he would have given testimony the same as Dr. Richoux. The transcript of the competency hearing, however, is not contained in the record on appeal.

. The report also noted that Mr. Wilson had a mild speech articulation problem.

. In his statement to police, Mr. Wilson indicates that he panicked after the incident; and after he was dropped off at home, he threw the gun he had in the canal near his house.

. Although Mr. Wilson denies ever shooting Mr. Eyzaguirre, he concedes that he is still responsible as principal to the robbery and, thus, the shooting.

. The Louisiana Constitution differs from the Eighth Amendment to the United States Constitution in its explicit prohibition of excessive sentences. This "deliberate inclusion by the redactors of the Constitution of a prohibition against 'excessive' as well as cruel and unusual punishment broadened the duty of this court to review the sentencing aspects of criminal statutes.” State v. Hamdalla, 12-1413, p. 14 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, 626, writ denied, 13-2587 (La.4/25/14), 138 So.3d 642 (quoting State v. Baxley, 94-2982, p. 4 (La.5/22/95), 656 So.2d 973, 977).

. In Godfrey, the United States Supreme Court examined a death sentence where the defendant shot and killed both his wife and mother-in-law with a single shotgun blast, to each head. At sentencing, the jury imposed the death penalty solely on the basis that the defendant's offenses were "outrageous, or wantonly vile, horrible or inhuman.” Godfrey, 446 U.S. at 422, 100 S.Ct. 1759. Under Georgia law, a person convicted of murder may be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.” Id. (citing Ga.Code § 27-2534.1(b)(7) (1978)). Although the Georgia capital punishment statute specified standards to guide the jury’s discretion, the jury apparently failed to consider such standards in imposing the death sentence. Even though the Georgia Supreme Court affirmed the sentence, holding only that the language used by the jury was "not objectionable” and the evidence supported the finding of the presence of the aggravating circumstance, the court failed to rule whether, on the facts, the offense involved torture or an aggravated battery to the victim. Id. at 427, 100 S.Ct. 1759.

. In Furman, the United States Supreme Court reviewed death sentences for three defendants who were convicted of the following offenses: murder in Georgia; rape in Georgia; rape in Texas. The United States Supreme Court held that the imposition and carrying out of the death penalty in these cases constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Furman, 408 U.S. at 239-40, 92 S.Ct. 2726.