PER CURIAM.
 

 bln what the state, termed particularly egregious and predatory acts of contractor fraud in New Orleans following Hurricane Katrina, 63-year-old defendant/respondent, a former elected state representative in Alabama, entered guilty pleas in November 2009, to six counts of felony theft in violation of La.R.S. 14:67. The total loss to the six victims came to over $250,000, much of it Road Home money distributed to homeowners to rebuild in the aftermath of the storm. The trial court ordered a presentence investigation and on February 12, 2010, conducted a sentencing hearing at which the victims on each count, or members of their family, testified about their losses. The defense called several witnesses in mitigation. At the close of the hearing, the trial court sentenced respondent on each count to consecutive terms of 10 years imprisonment at hard labor, for a total of 60 years imprisonment at hard labor. On appeal, the Fourth Circuit affirmed respondent’s convictions but vacated his sentences as excessive and remanded the case to the trial court for resentencing.
 
 State v. Colvin,
 
 10-1092 (La.App. 4th Cir.4/20/11), 65 So.3d 669. We granted the state’s application to review that decision and reverse for reasons that follow.
 

 |2The record below, including transcripts of the preliminary examination conducted on August 3, 2009, the sentencing hearing conducted on February 12, 2010, and the presentence report, reveals that in the fall of 2007 and spring of 2008 respondent entered into a series of construction contracts with homeowners in New Orleans attempting to rebuild after Hurricane Katrina. Respondent held himself out as a
 
 *665
 
 licensed contractor doing business as Col-vin Modular Homes, LLC. However, information provided by Carl Bourke, a Residential Compliance Supervisor for the State Licensing Board for Contractors, indicated that respondent was not then, nor ever, a licensed contractor in Louisiana, although Louisiana law required him to register if he undertook home improvement contracting services. La.R.S. 37:2175.2(A) (“No person shall undertake, offer to undertake, or agree to perform home improvement contracting services unless registered with and approved by the Residential Building Contractors Subcommittee of the State Licensing Board for Contractors as a home improvement contractor.”). Louisiana law also prohibited respondent from “[ojperating without a certificate of registration issued by the subcommittee,” La. R.S. 37:2175.3(A)(1), or from “[m]aking any material misrepresentation in the procurement of a contract,” La.R.S. 37:2175.3(A)(4), or from “[m]aking a false representation that the person is a state licensed general contractor.” La. R.S. 37:2175.3(A)(8). The present contract amounts generally exceeded $100,000, had no completion dates, required the homeowners to secure insurance, and entailed substantial down payments.
 

 As documented in the testimony at the sentencing hearing, in the majority of the six cases, the homeowners paid tens of thousands of dollars for little or nothing. Brenda Turner gave respondent a total of $40,000 for “five loads of sand” on her lot, and “that’s all” she received. Willie King’s parents gave respondent $43,200 in return for which respondent “placed four stakes and ran string from the four stakes,” before disappearing. Ida Warfield Kirklon paid respondent at total of |3$39,400 for some holes dug on her property, “no ribbon, nothing .... just dug up with holes, that was it.” Her loss meant that she had gone into her retirement savings in an attempt to rebuild not only for herself but also for her son, who had developed mental problems, including depression, “because he’s constantly upset and talks about the fact that we don’t have a house.” Emily Marshall gave respondent $47,200, after which he “dug up the ground, put down a couple of 2 x 4’s, strung some string around it, but nothing else was done.”
 

 On the remaining counts, Alton Joseph made an initial payment of $45,000, then paid an additional $18,500 for a foundation slab and a shed placed on a new piece of property he purchased with respondent’s help when he refunded $5,000 of Joseph’s money. While Joseph waited for his modular home, respondent also paid for his rent for six months until he disappeared altogether with the rest of Joseph’s money, after which Joseph paid $49,000 to a new contractor, who was apparently associated with respondent, to build his home, “only fixing the weatherboards on the outside, do the plumbing work and electrical work and then we had to take it from there.” He and his wife moved in on Christmas day but they had no electricity or water. They “put a mattress in the kitchen, lived in a house like that, a shell, and worked on it a little at a time.” Annette Rainey paid respondent $50,000 in Road Home money in September 2007, with the understanding that she would be in her new home by Christmas. Respondent put a foundation on her property but nothing more, and at the time of sentencing, Rainey still was not in a new home.
 

 | Louisiana. Respondent was then extra-As complaints poured into the Contractor Fraud Unit of the Orleans Parish District Attorney’s Office, warrants issued for respondent’s arrest on November 14, 2008. By that time, respondent had returned to his home state of Alabama, where local authorities arrested him after receiving copies of the warrants issued in
 
 *666
 
 dited to Louisiana to face six counts of felony theft in amounts over $500.
 

 Before sentencing, defense counsel submitted an extensive memorandum detailing reasons why respondent should receive a probated sentence. Counsel contended that the crimes resulted from business ineptitude, were non-violent, and resulted only in economic harm that could best be redressed by restitution, an alternative available only if respondent received probation. The memorandum further argued against lengthy incarceration of an offender who was in his 60’s and likely represented a significant financial burden to Louisiana taxpayers, not only because of the routine costs of incarceration but also because of the costs associated with medical care for an aging prisoner. Even with parole eligibility at one-third of his term as a first offender, La. R.S. 15:574.4(A), respondent would be likely to die in the penitentiary if given a substantial sentence of imprisonment. Counsel thus argued that a probationary sentenced served the multiple goals of reducing judicial costs, correctional costs, taxpayer costs, and, ultimately, affording respondent’s victims their only realistic chance at restitution.
 

 In addition, at the sentencing hearing, counsel called several witnesses to attest to respondent’s caring and generous character, as illustrated by specific instances in which he bought uniforms for members of his daughter’s cheerleading team who could not afford them, provided Christmas toys and clothing for the children in his extended family, and helped a troubled University of Alabama football player in his rehabilitation after he was arrested for drugs. Respondent’s good deeds extended to his public life, in which he served on the Water Board in a small Alabama community and personally contributed to the installation of water meters in rural areas where families had no running water. Respondent also served two years in the Alabama legislature focusing on programs to provide recreational opportunities for children. Ralph Burke, who served in the Alabama House of ^Representatives with respondent, attested to his good character and expressed his firm conviction that respondent would make restitution to his victims. Burke had become a business associate of respondent after he left the Alabama legislature. They had engaged in the sale of carpeting, furniture, and portable classrooms, and respondent paid Burke’s commissions on the sales reliably, just as, the witness assured the court, he would make restitution to the victims in the present case. In general, other Alabama public officials shared Burke’s opinion. The trial court had received a letter in support of respondent from Jim Folsom, the Lieutenant Governor of Alabama, and letters from other members of the Alabama House of Representatives, all attesting to respondent’s good character. Respondent also addressed the court directly, expressed his remorse, and his desire to make restitution and for forgiveness, just as he would forgive unnamed persons who had “beat” him out of $250,000.
 

 The defense presentation left the trial judge unmoved. “This has been a precipitous fall,” the court informed respondent just before imposing sentence, “you go from being a public servant, an elected official, to being a public predator and a convicted felon.” The court elaborated:
 

 I find the behavior unconscionable and, yes, predatory and deeply offensive. Half of my courtroom is filled right now with victims, people who were hurt by what you did to them. They’re older people, they’re working class people. You’ve not only taken their money from them, you’ve not only deprived them of the homes that they dreamed to be able to return to, but you’ve taken their
 
 *667
 
 dreams, you’ve taken their health in some instances.... And this is not an isolated incident. This wasn’t a contract dispute, this is not a civil matter. It’s a pattern of behavior aimed at bilking people out of their money, out of their hard earned money and frustrating their efforts to return to some degree of normalcy to retain not only their homes, but their lives.... Mr. Colvin, in exchange for your promises and all that you have done, sir, there’s a trail of lies and broken promises and empty lots, I’m sure I speak for these folks when I say that your apology rings hollow, sir, when these people are still struggling to this day.... This is wrong, sir. I feel compelled to send the only message that I can and do hold you entirely responsible for your behavior.
 

 |ROn appeal, the Fourth Circuit acknowledged that respondent had failed to file a motion to reconsider sentence under La. C.Cr.P. art. 881.1 or otherwise object at the close of sentencing to the terms of imprisonment imposed by the trial court, a procedural default that would ordinarily bar appellate review of sentence.
 
 State v. Mims,
 
 619 So.2d 1059 (La.1993). However, the court of appeal deemed the detailed, pre-sentencing memorandum filed on respondent’s behalf, and subsequently marked “Denied” by the trial judge, sufficient to preserve appellate review of his sentences.
 
 Colvin,
 
 10-1092 at 5, 65 So.3d at 672. On the merits of respondent’s sentencing claim, the appellate court noted this Court’s preference for concurrent, as opposed to consecutive, sentences imposed on first offenders in the absence of a showing that the offender “ ‘poses an unusual risk to the safety of the public, similar to those posed by habitual or by dangerous offenders.’”
 
 Colvin,
 
 10-1092 at 13, 65 So.3d at 678 (quoting
 
 State v. Jacobs,
 
 383 So.2d 342, 345 (La.1980); cf. La.C.Cr.P. art. 883 (“If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.”)). Considering the mitigating evidence presented to the trial judge, including respondent’s age, his efforts to mitigate the loss to one of his victims, Alton Joseph, by returning $5,000 of his money, and respondent’s clean prior record and first offender status, the court of appeal panel unanimously found respondent’s punishment excessive. However, in vacating respondent’s sentences and remanding the case to the trial court for resentencing, the court of appeal further noted that a 10-year sentence,
 
 ie.,
 
 simply amending respondent’s sentences from consecutive to concurrent, was not “sufficient either, considering the extreme economic and emotional harm suffered by the victims in this case.” Id., 10-1092 at 15, 65 So.3d at 679. The court of appeal thus contemplated that an appropriate, non-excessive sentence, 17would mix concurrent and consecutive sentences within a range determined by the trial court on remand of the case.
 

 We may assume here that, as the court of appeal found, respondent’s detailed sentencing memorandum setting forth grounds for suspending sentence and placing him on probation preserved review of his sentencing claims on appeal.
 
 Cf.
 
 La.C.Cr.P. art. 841(B) (“The requirement of an objection shall not apply to the court’s ruling on any written motion.”). However, we agree with the state that the court of appeal lost sight of a fundamental principle of sentence review at the appellate level that we have repeatedly stressed. The pertinent question on appellate review is “whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropri
 
 *668
 
 ate.”
 
 State v. Humphrey,
 
 445 So.2d 1155, 1165 (La.1984);
 
 see also State v. Taves,
 
 03-0518, p. 4 (La.12/3/03), 861 So.2d 144, 147 (per curiam)(collecting cases). A trial court “abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const, art. I, § 20,
 
 ie.,
 
 when it imposes ‘punishment disproportionate to the offense.’ ”
 
 State v. Soraparu,
 
 97-1027 (La.10/13/97), 703 So.2d 608 (quoting
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979)). In making that determination, “we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.”
 
 State v. Bonanno,
 
 384 So.2d 355, 358 (La.1980).
 

 In the present case, the trial court gave respondent a full and fair opportunity to present the case for mitigating punishment of a pattern of conduct that clearly reflected more than business ineptitude and was fraudulent from the outset when respondent falsely represented himself as a licensed contractor in Louisiana, conducting a business that nothing in his background apparently qualified him to perform. Despite the defense showing, the trial court ultimately agreed with the [¿prosecutor that respondent was “not here today before the Court because of what he did for the State of Alabama. He’s here today because of what he did to the citizens of Orleans Parish.” Respondent expressed remorse and contrition at the sentencing hearing but he had, only a month before, in the interview with the probation officer preparing the presentence report, claimed that he had paid another contractor in advance to lay the foundations for several properties and that the contractor had bungled the jobs, greatly increasing the length of time to complete the tasks and consuming the funds advanced to him to build modular homes for the victims, with the result that he did not use any of the money for personal gain. The remarks explained respondent’s parting words at sentencing, in which he asked for forgiveness just as he had forgiven “those people that beat me out of all that money.” The extent to which respondent accepted responsibility for the victims’ losses and the degree to which he was committed to making restitution by entering his guilty pleas was therefore open to considerable doubt, and Alton Joseph had his own opinion of what respondent meant when he paid back $5,000 of the $63,000 Joseph had given him. Joseph testified that in the face of his repeated demands for all of his money back, respondent had explained “that we [were] not going to throw the baby out with the water .... he gave me $5,000 and that was supposed to be towards the lot for ... him not to give me my money [back].”
 

 The trial court fully articulated the reasons underlying its determination that the present case involved “maximum sentences are reserved for [ ] the most serious violations of the charged offense.”
 
 State v. Quebedeaux,
 
 424 So.2d 1009, 1014 (La.1982). The record fully supports that conclusion. Similarly, the court justified its decision to consider respondent an exceptional risk to public safety for whom consecutive sentences are appropriate because he had preyed systematically on distressed homeowners attempting to rebuild their lives in the aftermath of|9Hurricane Katrina, and he was good at it. “[H]e had this knack about invoking his mother and God,” Willie King testified at sentencing, “He just had that knack about him that, you know, it’s like, well, maybe this guy might do it.” Willie King recalled that when his parents, both in their late 70’s decided to sign the contract, they all stood around a table and prayed “that God guide his hands to finish my parents home.” “And
 
 *669
 
 just like the gentleman said,” Andrea Marshall testifying on her mother’s behalf and referring to Willie King’s statement, “he brought his family into it, God, his children. He even had the ‘lil girl running around.” The presentence report also indicated that at the time of sentencing, respondent had pending five additional theft charges in Jefferson Parish, further underscoring the social risk he posed.
 
 State v. Myles,
 
 94-0217, pp. 2-3 (La.6/3/94); 638 So.2d 218, 219 (sources of information relied upon by the sentencing court are varied and may include evidence usually excluded from the courtroom at the trial of guilt or innocence,
 
 e.g.,
 
 hearsay and arrest as well as conviction records)(citing
 
 Williams v. New York,
 
 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337(1949)). The prosecutor emphasized the significance of those pending cases when she observed, regarding probation as a sentencing option: “And let’s be honest, he’s not getting out because after we deal with him in Orleans Parish, then he’s shipped to Jefferson Parish.”
 
 [1]
 

 Given respondent’s apparently productive and law-abiding life in Alabama and his public service in that state, there may be no accounting for his conduct in Orleans Parish at the close of 2007 and spring of 2008. Respondent’s brother testified on his behalf at the sentencing hearing and was at loss to “understand how this happened.” Nevertheless, given all of the circumstances in the present case, we find no abuse of the trial court’s broad sentencing discretion. Accordingly, the [indecision of the Fourth Circuit is reversed, the sentences imposed by the trial court are reinstated, and this case is remanded for purposes of execution of sentence.
 

 COURT OF APPEAL DECISION REVERSED; SENTENCES REINSTATED; REMANDED
 

 [1]
 

 . The state asserts in brief that respondent was subsequently convicted in Jefferson Parish on all five counts.