STATE OF LOUISIANA　　　*　　NO. 2021-KA-0273

VERSUS　　　　　　　　　　*

TRAVON D. MANUEL　　　　*　　COURT OF APPEAL

　　　　　　　　　　　　　　FOURTH CIRCUIT

　　　　　　　　　　　*

　　　　　　　　　　　　　　STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 533-848, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
**JUDGE SANDRA CABRINA JENKINS**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Sandra Cabrina Jenkins,
Judge Dale N. Atkins)

Jason Rogers Williams
DISTRICT ATTORNEY
G. Benjamin Cohen
ASSISTANT DISTRICT ATTORNEY
Brad Scott
ASSISTANT DISTRICT ATTORNEY
Orleans Parish District Attorney's Office
619 S. White Street
New Orleans, LA 70119

　　　COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, LA 70073

　　　COUNSEL FOR DEFENDANT/APPELLANT

**VACATED IN PART; AFFIRMED IN PART; REMANDED**

**APRIL 6, 2022**

*SCJ*
*RML*
*DNA*

Defendant, Travon Manuel, was convicted, by a non-unanimous jury, of attempted manslaughter and, by a unanimous jury, of attempted obstruction of justice. Defendant now appeals his convictions and sentences. In accordance with *Ramos v. Louisiana*, 590 U.S. __, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), which declared that non-unanimous jury verdicts in state felony trials are unconstitutional, we vacate defendant's conviction for attempted manslaughter. *See State v. Donovan*, 19-0722 (La. App. 4 Cir. 5/27/20), 301 So.3d 541. In regards to his conviction for attempted obstruction of justice, we find no error and affirm his conviction and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 27, 2016, during the weekend of the Bayou Classic football game, a mass shooting occurred at approximately 1:30 a.m., in the 100 block of

1

Bourbon Street in the French Quarter. Ten people were struck by gunfire, one of whom was killed.[1]

New Orleans Police Department ("NOPD") Detective Colleen Formanek testified that on the night of the shooting, she was patrolling in the 100 block of Bourbon Street. Det. Formanek had just broken up a fight between two individuals and was placing one of the individuals in custody, when several gunshots were fired. At the time of the shooting, Det. Formanek's body worn camera was activated and recorded the shooting incident. The recording, played for the jury, reflected at least five gunshots were fired. Det. Formanek described the aftermath of the shooting as chaotic, but she remained on the scene to locate victims and witnesses to the shooting.

NOPD Detective Barret Morton testified that he was assigned to investigate the shooting and homicide that occurred on Bourbon Street on November 27, 2016. When he arrived at the scene of the shooting, Det. Morton observed five .40 caliber spent shell casings in the middle of Bourbon Street and one .40 caliber spent bullet on Iberville Street, at the corner with Bourbon Street. Det. Morton and other officers went to several businesses in that area to interview potential witnesses and recover any surveillance footage.

At a restaurant located in the same block where the shooting occurred, officers recovered video surveillance that captured the shooting. The video, played

---

[1] Seven of the surviving victims testified at trial regarding their locations and actions at the time of the shooting as well as the extent of their injuries, the details of which are not relevant to the assignments of error raised on appeal and are not discussed herein. As discussed *infra*, two of the surviving victims, Brittney Ben and Deion Ben, knew Jordan Clay, the other shooter, and witnessed the shooting.

for the jury, showed an individual, later identified as defendant, walk into a crowd, approach and "face off" with another man, later identified as Jordan Clay. The video then shows defendant raise a weapon and begin shooting towards Clay, who returns gunfire with a weapon; also, as the crowd and Clay begin to flee from the gunfire, defendant remains in position, shooting several rounds. The .40 caliber spent casings were recovered from where defendant was standing on Bourbon Street during the shooting.

Det. Morton further testified that all surviving shooting victims were interviewed. Based upon interviews with two of the victims, Brittany Ben and Deion Ben, Det. Morton identified the two shooters as defendant, who was known by the nickname of "Tiki", and Clay. Brittney and Deion Ben were with Clay at the time of the shooting.[2] The other seven surviving shooting victims did not have any connection to either Clay or defendant.

During his investigation, Det. Morton learned that defendant and Clay knew each other from Lafayette, Louisiana, from which both had travelled to New Orleans for the Bayou Classic weekend. Defendant and Clay had "an ongoing feud" that involved defendant's girlfriend, who had a prior relationship with Clay. In the weeks prior to the shooting, the two men had an altercation at a park in

---

[2] Brittney Ben testified at the trial that she knew of Clay prior to the shooting. On the night of the shooting, she was with her nephew, Deion Ben, who also knew Clay. They saw Clay and defendant have an argument before the shooting. Brittney also testified that she sustained five gunshot wounds during the shooting. While she was being treated in the hospital, defendant came to see her and apologized to her, stating that he was shooting at somebody else.

Deion Ben testified that he knew Clay from Lafayette, they were friends, and they were together on Bourbon Street at the time of the shooting. Deion denied seeing an argument before the shooting, but he stated he was standing by Clay when he was shot.

Lafayette, during which Clay punched defendant and knocked him unconscious. Based upon the information gathered during his investigation, Det. Morton contacted the Lafayette Police Department and Louisiana State Police Investigator Anthony Pardo, who was assigned to the Lafayette region, to assist in locating defendant and Clay.

Investigator Pardo testified that, within days of the shooting, he located, interviewed, and arrested Clay. Investigator Pardo and other officers also searched for defendant at several locations, finally locating him at the house of his child's mother in Lafayette. Investigator Pardo observed defendant getting out of a gold Mercedes-Benz vehicle and walking up to the entry of the house. As Investigator Pardo approached him, defendant appeared nervous and stated, "[y]ou know, I was about to come turn myself in" and "I just wanted to say bye to my little boy." Investigator Pardo then transported defendant to State Police Region 2 headquarters for a recorded interview, which was played for the jury.

Investigator Pardo also procured a search warrant for defendant's gold Mercedes-Benz. In the search of the vehicle, officers discovered a backpack, inside of which was a clear Ziploc bag with "a large amount of marijuana." Also within the vehicle, officers located a 9-millimeter handgun with an extended, high-capacity magazine.

Louisiana State Trooper Christopher Ledet testified that he assisted in serving a search warrant at the house of defendant's mother, who also signed a consent to search form when they arrived. Defendant's mother informed them that

4

defendant had a bedroom he used when he stayed at the house. In that room, under the bed, Trooper Ledet recovered a Glock .40 caliber semi-automatic handgun with an extended magazine.

The section chief of the Forensic Firearms Unit for the NOPD Crime Lab, Sean McElrath, testified as an expert in the field of firearms, ballistics analysis and identification. McElrath stated that he examined the spent ammunition at the scene of the shooting as well as the two guns recovered during the execution of the search warrants, and he prepared a report of his findings. In his examination of the five bullet casings found at the scene of the shooting, McElrath concluded that they were all fired from the same weapon, a Glock .40 caliber handgun. McElrath also test-fired the Glock handgun, seized in the search of defendant's mother's home, and, upon analyzing the results in comparison to the spent bullet casings, concluded that the five spent casings from the shooting were fired from that particular Glock.

After defendant was arrested in connection with the shooting, he was held in custody at Orleans Parish Prison, where his jail calls were recorded. The custodian of the recorded jail calls, Jim Huey, testified to authenticate three jail calls placed by defendant to his girlfriend. The recordings were played for the jury. In one call recorded on December 5, 2016, defendant stated he was going to "beat this" and his girlfriend agreed, saying to defendant that he "played it smart", to which defendant replied, "by leaving the gun," and she replied "yeah." Defendant then cut off the conversation, saying "shhh."

5

Testifying in his own defense at trial, defendant stated he knew Clay from Lafayette, and he admitted that they had a fight at a basketball court a few weeks before the shooting, but he denied having an ongoing feud with Clay. On November 26, 2016, defendant joined some friends on a trip from Lafayette to New Orleans for Bayou Classic festivities. Defendant admitted he had his gun, a .40 caliber Glock, with him and stated he had been carrying it since his cousin had been killed, not because of any altercation.

Upon arriving in New Orleans around midnight on November 27, 2016, defendant and friends started walking to Bourbon Street, where defendant saw people he knew from Lafayette, including Clay. When he noticed Clay, defendant stated that he and Clay "exchanged words," but that he walked away after that exchange. Defendant returned a little later to look for another friend, and he saw Clay who was "backing up pulling out a gun." Defendant stated that Clay fired first but when he heard a gunshot, "[defendant] most definitely did shoot back." Defendant stated he did not know how many shots he fired but, when he got back to the car, he looked and noticed five or six shells missing from his gun. Defendant also admitted that he and his friends returned to Lafayette that night.

Defendant acknowledged that he was taken in for questioning by police on December 2, 2016. He admitted that, at first, he was not truthful with police about his involvement in the shooting, but that he eventually told them that he was "acting in self-defense."

6

On cross-examination, when asked where he went after the shooting, defendant stated he did not realize anything was wrong, so he and his friends stopped by the Waffle House, which was not letting people in, then they kept walking and, eventually, they got in the car and went back to Lafayette. Defendant claimed he did not know that he was involved with the shooting or that police would want to talk to him; he also claimed he did not hear any news of the shooting, which was covered in the local and national news. When asked why he hid his gun, defendant asserted that, if he were trying to get rid of evidence, he would have discarded the gun, but he did not, and he put it back where he always kept it. However, defendant admitted that he lied to State Police investigators about the gun, claiming he did not have a weapon on the night of the shootings; then, when confronted by video of the shooting, claiming that he shot his gun into the air rather than into the crowd; and telling them that the gun he used was "finito."

On March 30, 2017, the State filed a grand jury indictment charging defendant and Clay, as a co-defendant, with one count of carrying a concealed firearm, in violation of La. R.S. 14:95; one count of second-degree murder, in violation of La. R.S. 14:30.1; one count of attempted second-degree murder, in violation of La. R.S. 14:(27)30.1; and one count of obstruction of justice in a second-degree murder investigation, in violation of La. R.S. 14:130.1. At arraignment, defendant pled not guilty to all charges.

Subsequently, defendant filed a motion to sever his trial from the trial of Clay. The State did not file an objection to the motion to sever, and the trial court granted defendant's motion to sever the trials.

Defendant's trial commenced on June 25, 2019. At the conclusion of a four-day trial, the jury rendered verdicts on two of the three felony counts in the indictment. The jury could not reach a verdict on the count of second-degree murder. On the count of attempted second-degree murder, the jury returned a non-unanimous verdict (11-1) of guilty of attempted manslaughter. On the count of obstruction of justice, the jury returned a unanimous verdict of attempted obstruction of justice. After the jury rendered its verdict, the trial judge found defendant guilty of the misdemeanor count of carrying a concealed firearm.

On September 20, 2019, the trial court held a sentencing hearing and imposed sentences of twenty years for each conviction, to run consecutively with each other. The trial court then set a pre-trial date for a retrial on the charge of second-degree murder.

In October 2020, defendant filed a notice of appeal of his convictions for attempted manslaughter and attempted obstruction of justice.

## ERRORS PATENT

In accordance with La. C.Cr.P. art. 920(2), this Court reviews all appeals for errors patent on the face of the record. A review of the record reveals one error

8

patent—defendant's conviction by a non-unanimous jury verdict—which defendant also raises as his first assignment of error, discussed *infra*.[3]

**DISCUSSION**

On appeal, defendant raises three assignments of error: (1) his conviction for attempted manslaughter by a non-unanimous jury verdict is unconstitutional; (2) the evidence presented at trial is insufficient to sustain his conviction for attempted obstruction of justice; and (3) his twenty-year sentence for attempted obstruction of justice is unconstitutionally excessive.

### *Assignment of Error No. 1: Non-unanimous conviction*

Defendant argues that his conviction for attempted manslaughter by a jury verdict of 11-1 is unconstitutional and must be vacated, pursuant to *Ramos v. Louisiana*, *supra*. We agree.

At the time of defendant's trial, in June 2019, Louisiana law allowed for non-unanimous jury verdicts in felony trials. In addition, the controlling Louisiana jurisprudence consistently upheld the constitutionality of non-unanimous jury verdicts. *See State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So.3d 738.

Prior to the filing of defendant's appeal, on April 20, 2020, the United States Supreme Court rendered its decision in *Ramos v. Louisiana*, *supra*, setting forth a new constitutional rule: the Sixth Amendment right to a jury trial, as incorporated against the states through the Fourteenth Amendment, requires a unanimous jury

---

[3] *See State v. Varnado*, 20-00356, p. 1 (La. 6/3/20), 296 So.3d 1051 ("If the non-unanimous jury claim was not preserved for review in the trial court or was abandoned during any stage of the proceedings, the court of appeal should nonetheless consider the issue as part of its error patent review.").

9

verdict to convict a defendant in state felony trials. Moreover, the new constitutional rule announced in *Ramos* applies retroactively to all criminal cases, state or federal, pending on direct review. *See State v. Donovan*, 19-0722, pp. 5-6 (La. App. 4 Cir. 5/27/20), 301 So.3d 541, 544-45.

Applying *Ramos* to this direct appeal, we find that defendant's non-unanimous conviction and sentence for attempted manslaughter are unconstitutional. Accordingly, we vacate that conviction.

### Assignment of Error No. 2: Insufficient evidence

In his second assignment of error, defendant argues that the State failed to produce evidence sufficient to support his conviction for attempted obstruction of justice.

When reviewing the sufficiency of the evidence to support a conviction, appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, the appellate court "must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt." *State v. Pigford*, 05-0477, pp. 5-6 (La. 2/22/06), 922 So.2d 517, 520-21. All evidence, direct and circumstantial, must meet the *Jackson* standard. *State v. Carter*, 99-2234, p. 30 (La. App. 4 Cir. 1/24/01), 779 So.2d 125, 144.

When circumstantial evidence forms the basis of a conviction, such evidence must consist of "collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Carter*, 99-2234, p. 31, 779 So.2d at 144. "[I]n cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of defendant's guilt beyond a reasonable doubt." *Pigford*, 05-0477, p. 6, 922 So.2d at 521. Ultimately, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.

In this appeal, defendant argues that the circumstantial evidence presented by the State is insufficient to sustain a conviction for attempted obstruction of justice, a responsive verdict to, and a lesser included offense of, the charge of obstruction of justice. *See* La. R.S. 14:27(C).[4] It is well-settled that if the evidence adduced at trial was sufficient to support a conviction of the charged offense, then the evidence "will necessarily support conviction of a lesser and included offense." *State v. Jones*, 15-0123, p. 37 (La. App. 4 Cir. 12/2/15), 182 So.3d 251, 276.

---

[4] "An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt." La. R.S. 14:27(C).

The crime of obstruction of justice is defined in La. R.S. 14:130.1, in pertinent part, as follows:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

1. Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

a. At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers;

Obstruction of justice under La. R.S. 14:130.1 is a specific intent crime. To support a conviction for the offense, the State must prove beyond a reasonable doubt that defendant intentionally altered, moved, or removed evidence from a location he had reason to know would be the subject of investigation, with the specific intent of distorting the results of any criminal investigation.

Defendant asserts that the State failed to prove the necessary element of specific intent to distort the criminal investigation. "'Specific intent' is the state of mind that exists when circumstances indicate the offender actively desires prescribed criminal consequences to follow his act. Specific intent need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant." *State v. Dorsey*, 20-0029, p. 12 (La. App. 4 Cir. 12/9/20), 312 So.3d 652, 660 (citations omitted).

12

At trial, defendant admitted that he was involved in the shooting on November 27, 2016. He further admitted that, rather than remaining on scene, he fled the area, returning to Lafayette, instead of staying on scene to assert his claim of firing shots in self-defense. Thereafter, he learned that authorities were looking for him, having learned of Clay's arrest, but he did not turn himself into authorities. At trial, he asserted that he put the .40 caliber Glock gun back where he always kept it; however, he admitted to lying to investigators about having a gun, its whereabouts, and his involvement in the shooting. Moreover, the jury heard the jail calls between defendant and his girlfriend in which he stated he would "beat this shit" and agreeing with her that he "played it smart."

Defendant's actions of fleeing the scene of the shooting, concealing the weapon in his mother's house underneath a bed, and lying to investigators about his involvement in the shooting as well as the gun he used, all indicate his specific intent to distort the results of the criminal investigation of the shooting. In addition, the trier of fact's "determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence." *Dorsey*, 20-0029, p. 10, 312 So.3d at 659. "The testimony of a single witness if believed by the trier of fact, is sufficient to support a conviction." *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306.

From our review of the record of this case, viewing all evidence and testimony in the light most favorable to the prosecution, we find that a rational trier

of fact could have found, beyond a reasonable doubt, that defendant attempted to obstruct justice by tampering with evidence with the specific intent of distorting the results of the criminal investigation of the shooting. Accordingly, we find no merit to this assignment of error.

*Assignment of Error No. 3: Excessive sentence*

In his third and final assignment of error, defendant asserts that his sentence of twenty years for attempted obstruction of justice, the maximum statutory term of imprisonment for the offense, is excessive.

Before reviewing the merits of the claim, our review of the record reflects that defendant failed to object to the sentence at the time it was imposed and, thereafter, failed to file a motion to reconsider sentence. Pursuant to La. C.Cr.P. art. 881.1, a defendant's failure to make or file a motion to reconsider sentence shall preclude defendant from urging on appeal any grounds of objection to the sentence. *See State v. Kirkling*, 04-1906, pp. 5-6 (La. App. 4 Cir. 5/18/05), 904 So.2d 786, 790. Due to his failure to object and file a motion to reconsider his sentence, appellate review of defendant's sentence is "limited to a bare review for constitutional excessiveness." *State v. Zeitoun*, 17-0366, p. 10 (La. App. 4 Cir. 11/8/17), 231 So.3d 934, 945.

Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of cruel and unusual punishment. Additionally, the Louisiana Constitution explicitly prohibits "excessive punishment." *State v. Wilson*, 14-1267, p. 23 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. A sentence is excessive, even when it is within the

applicable statutory range, if it is "grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering." *Id.*, p. 25, 165 So.3d at 1166 (quoting *State v. Hackett*, 13-0178, p. 14 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174). In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice. *State v. Wilson*, 11-0960, p. 9 (La. App. 4 Cir. 9/5/12), 99 So.3d 1067, 1073 (quoting *State v. Colvin*, 11-1040, p. 7 (La. 3/13/12), 85 So.3d 663, 667-68).

The trial court is afforded wide discretion in determining sentences, and the appellate court will not set aside a sentence for excessiveness if the record supports the sentence imposed and there is no manifest abuse of discretion by the trial judge. *State v. Bradley*, 18-0734, pp. 8-9 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100 (quoting *State v. Williams*, 15-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16) 186 So.3d 242, 250).

In this case, the trial court imposed the maximum statutory sentence of twenty years for defendant's conviction of attempted obstruction of justice. *See* La. R.S. 14:27(D)(3), La. R.S. 14:103.1(B)(1).[5] Upon review of the sentencing, we find that the trial court adequately complied with statutory guidelines in La.

---

[5] La. R.S. 14:27(D)(3) provides, in pertinent part, that a person convicted of attempting to commit a crime shall be imprisoned in the same manner as for the offense attempted; however, such imprisonment shall not exceed "one-half of the longest term of imprisonment prescribed for the offense so attempted …."

La. R.S. 14:130.1(B)(1) provides, in pertinent part, that when "the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be … imprisoned for not more than forty years at hard labor …." In this case, the criminal proceeding in which defendant was charged with obstruction of justice involved a second degree murder charge, for which a sentence of life is mandatory. Consequently, the maximum possible sentence to be imposed on defendant was forty years for obstruction of justice, and twenty years for attempted obstruction of justice.

C.Cr.P. art. 894.1 by articulating several factors considered in its determination of defendant's sentence. The trial court took into account defendant's youth and "relative lack of criminal history." But, the trial court noted that such mitigating factors were tempered by the fact that defendant possessed two weapons: the murder weapon, which he hid under his bed at his mother's house; and a handgun with an extended magazine, which was found in his vehicle at the time of his apprehension. The trial court also took note of the suffering of the innocent victims, in particular, the decedent, acknowledging that while the second-degree murder count was not "before the [c]ourt," it was "part and parcel of the totality of the aggravating circumstances that this [c]ourt considers in imposing sentence."

Upon review, this Court will not set aside a sentence for excessiveness if the record supports the sentence imposed. The record of this case reflects defendant's callous and reckless disregard for life in firing several shots on Bourbon Street, during which incident nine people were injured and one person was killed. Defendant then fled back to Lafayette and concealed the weapon he fired that night. We find no error in the trial court's consideration of "the totality of the aggravating circumstances" in imposing the maximum twenty-year sentence for defendant's conviction of attempted obstruction of justice. *See State v. Berry*, 630 So.2d 1330, 1334-36 (La. App. 4th Cir. 1993) (finding the trial court could properly consider evidence adduced in connection with offenses for which defendant was acquitted). Thus, we find no merit to defendant's claim of an excessive sentence.

**CONCLUSION**

For the foregoing reasons, we vacate defendant's conviction for attempted manslaughter and remand for further proceedings. However, we affirm defendant's conviction and sentence for attempted obstruction of justice.

**VACATED IN PART; AFFIRMED IN PART; REMANDED**